## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In Re:

MIRABILIS VENTURES, INC.,

     Debtor.

_____/

MIRABILIS VENTURES, INC.,

     Plaintiff,

v.

BUCHANAN, INGERSOLL, & ROONEY,
P. L.,; SAXON, GILMORE, CARRAWAY,
GIBBONS, LASH & WILCOX, P. A.; and HANS C.
BEYER, An individual and as Attorney/Agent with
BUCHANAN, INGERSOLL & ROONEY and SAXON,
GILMORE, CARRAWAY, GIBBONS, LASH AND
WILCOX,

     Defendants.

_____/

CASE NO.: 6:08-bk-04327-KSJ

CHAPTER 11

ADV. PRO. NO.:

## **COMPLAINT**

    Plaintiff, Mirabilis Ventures, Inc., ("MVI") hereby sues Defendants, BUCHANAN, INGERSOLL & ROONEY, P. C. ("BIR"); SAXON, GILMORE, CARRAWAY; GIBBONS, LASH & WILCOX, P. A. ("Saxon Gilmore") and HANS C. BEYER ("BEYER"), individually and as Attorney/Agent with BUCHANAN, INGERSOLL & ROONEY, P.C., and SAXON, GILMORE, CARRAWAY, GIBBONS, LASH & WILCOX, P. A., and alleging as follows:

## NATURE OF THE ACTION

This is an action for compensatory damages against the Defendants stemming from their involvement and representation of MVI and its subsidiaries including but not limited to AEM.

## JURISDICTION AND VENUE

1. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157 because it arises in and is related to a case under Title 11 of the United States Code.

2. Defendants are subject to the personal jurisdiction of this Court because many of the tortuous acts alleged herein occurred in or were directed to the state of Florida. Upon information and belief, moreover, Defendant BIR is a Pennsylvania professional corporation authorized to transact business and maintains a law office and is engaged in systematic and continuous business activity within the state of Florida. Defendants are also subject to personal jurisdiction pursuant to 18 U.S.C. §1965(d). Defendant, Saxon Gilmore, is a Florida professional association with its principal place of business in Hillsborough County, Florida.

3. Venue is proper in this district pursuant to 28 U.S.C. §1409, 28 U.S.C. 1391(b), and 18 U.S.C. §1965(c).

4. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(O).

## THE PARTIES AND OTHER RELEVANT ENTITIES

5. Plaintiff, MVI, is a Nevada corporation with its principal place of business located at 341 N. Maitland Ave., Suite 201 in Maitland, Florida.

6. Defendant, BIR, is a full service law firm with its offices in Dade County, Florida.

7. Defendant, Beyer, is a resident of the State of Florida and an attorney licensed to practice law in the state of Florida and at all times material hereto was and an agent of either Defendant BIR or Saxon Gilmore. All of Beyer's acts, representations, and omissions alleged herein were made within the course and scope of his agency with either BIR or Saxon Gilmore. Beyer's law firms, BIR and Saxon Gilmore are liable for all acts, representations, and omissions made by Beyer in connection with his representation of MVI, its related companies and its subsidiaries including AEM when Beyer was employed by each law firm.

8. Upon information and belief, Berman is a citizen and resident of Broward County, Florida, and sui juris, who was at all times relevant to the events described herein a director, employee and agent of BKR and was acting within the scope of his employment and that agency.

9. This Court has subject matter jurisdiction of this action pursuant to Florida Statutes §26.012(2)(a).

10. The events giving rise to the claims alleged in this Complaint arose in Orange County, Florida. Venue in this Court is therefore proper pursuant to Florida Statutes Ch. 47.

11. All conditions precedent to the bringing of this action has occurred, or their performance has been waived by Defendants.

## GENERAL ALLEGATIONS

12.     At all times material hereto, Berman was licensed to practice law in the State of Florida and was actively engaged in the same.

13.     In or about August 2004, Frank Amodeo (Amodeo") was approached by principals of Presidion Corporation, a publicly-traded company, and its affiliates and subsidiaries (collectively "Presidion"), regarding developing and implementing a plan of reorganization for Presidion.

14.     At the time, Presidion owed over $55,000,000.00 in outstanding liabilities, with the majority of said liabilities being payroll taxes owed by certain professional employee organization operating subsidiaries of Presidion, including Sunshine Staff Leasing, Inc. a/k/a Presidion Solutions, I, Inc. ("Sunshine Staffing"); Sunshine Companies, II, Inc. ("Sunshine II"); Sunshine Companies, III, Inc. a/k/a Presidion Solutions, IV, Inc. ("Sunshine III"); and Sunshine Companies, IV, Inc. a/k/a Presidion Solutions, V, Inc. ("Sunshine IV") (collectively the "Sunshine Companies").

15.     Amodeo's proposed strategy involved deconsolidating, divesting, and liquidating the Sunshine Companies.

16.     The divestiture and liquidation of the Sunshine Companies would then be used to pay creditors, including the Internal Revenue Service.

17.     Additionally, Amodeo's proposed strategy allowed Presidion to deconsolidate its financials and separate itself from the excessive liabilities associated with its subsidiaries, allowing it to continue to conduct business as a going concern (collectively the "Sunshine Companies Plan").

18.     Because of the complexities involved in the Sunshine Companies Plan, particularly with regard to legal and tax implications of the proposed strategy, Amodeo sought advice and opinions from multiple professionals including Defendants, other attorneys, and accountants qualified to provide such advice.

19.     In or about November 2004, Amodeo retained Beyer and Buchanan Ingerson to represent and advise Amodeo as to the implications and potential consequences resulting from the Sunshine Companies Plan.

20.     Beyer attended numerous meetings and worked extensively in providing advice and counsel relevant to the Sunshine Companies Plan.

21.     In or about December 2004, Amodeo began to implement the Sunshine Companies Plan as Wellington Capital Group, Inc. ("Wellington"), a company owed by Amodeo, purchased the Sunshine Companies from Presidion, immediately dissolved the Sunshine Companies, and liquidated their remaining assets for a total liquidated value of approximately $3,000,000.00, all of which was paid over to the Internal Revenue Service.

22.     Beyer and Buchanan Ingersoll advised that the Sunshine Companies Plan, and the actions taken thereunder, complied with all local, state, and federal laws.

23.     Moreover, during the Sunshine Companies Plan, Amodeo sought and received legal and tax advice from various professionals which provided, in pertinent part, that any tax liabilities incurred by a subsidiary would remain with that subsidiary and such liability would not attach to the detriment of the parent company or affiliated subsidiaries pursuant to a strict silo theory of tax liability.

24.     Extensive legal research and written legal opinions were provided by professionals retained by Amodeo, including Beyer and Buchanan Ingersoll, to validate this legal opinion.

25.     In or about March 2005, Beyer left Buchanan Ingersoll to join Saxon Gilmore.

26.     Beyer informed Amodeo that the reason for his departure from Buchanan Ingersoll was a result of Buchanan Ingersoll's decision to move away from bankruptcy practice.

27.     Upon information and belief, Beyer and Buchanan Ingersoll failed to inform Amodeo that the actual reason for Beyer's departure from Buchanan Ingersoll was that Beyer had breached his fiduciary duties to clients by participating in self-dealing and entering into transactions with clients in which Beyer received a direct economic benefit about and beyond the compensation he received as their attorney.

28.     Immediately thereafter, Amodeo retained Beyer and Saxon Gilmore to provide the same services for which Beyer and Buchanan Ingersoll were previously retained to provide to Amodeo.

29.     Contemporaneous with this plan, a company called Stellar Industries, Inc., was purchased, and subsequently renamed Mirabilis Ventures, Inc. ("MVI").   At that time MVI was to act as a vehicle by which to hold an option to purchase 25% of the issued and outstanding common stock of Presidion for $100,000 (the "Presidion Stock Option").

30.     MVI and AEM were created to help reorganize and preserve the Professional Employer Organization ("PEO") assets of Presidion Solutions, Inc. ("PSI"),

a subsidiary of Presidion Corporation (sometimes collectively referred to herein as "Presidion"). Mirabilis and AEM were tasked with this job by Frank Amodeo and AQMI, a consulting organization hired by Presidion to resolve Presidion's outstanding problems, including mounting payroll tax liabilities.

31.     Amodeo and AQMI developed a plan for Presidion, which was primarily designed to preserve, restore, and maximize the inherent value of the Presidion PEO assets, which had become depressed because of a myriad of problems created by mismanagement of Presidion and its subsidiaries, including the acquisition of large payroll tax liability. The plan involved creating successor companies, MVI and AEM, to acquire the Presidion PEO assets, including two subsidiaries of PSI known as Professional Benefits Solutions, Inc. ("PBS") and Paradyme, Inc. ("Paradyme"), resell them, and use the proceeds to pay unsecured priority state and federal tax creditors.

32.     On January 8, 2005, Mirabilis purchased all shares of common stock issued to Burcham, the then chairman of Presidion (the "Burcham Shares").

33.     Amodeo and AQMI successfully completed the Sunshine Companies Plan in or about April 2005.

34.     In April 2005, MVI chose to distribute to the AQMI consultants the Burcham Shares, as opposed to acquiring stock pursuant to the Presidion Stock Option and distributing those shares to the AQMI consultants engaged relevant to the Sunshine Companies Plan. Based upon the advice provided by various professionals retained by MVI, including Defendants, Berman, BKR, Riguera and Wildermuth, it was determined that distributing the Burcham Shares, as opposed to exercising the Presidion Stock

Option, would allow MVI to operate as a creditor of Presidion, instead of as a major shareholder.

35.     MVI was initially capitalized by Titanium and AQMI, companies owned solely by Amodeo.  MVI would be further capitalized through: (i) MVI's provision of risk arbitrage services; and (ii) interim nonpayment of payroll taxes owed by PSI's PEO operating subsidiaries.

36.     In preparation for an eventual acquisition of the remaining Presidion PEO assets, in June 2005 MVI decided to acquire a PEO shell company called AEM.

37.     Based on tax and legal advice provided by professionals including Defendants BIR, Saxon Gilmore and Beyer, Amodeo proposed a strategy whereby Presidion would be provided working capital through:

     i.     PSI, accurately accounting and reporting the taxes collected by PBS and/or Paradyme, relevant to their respective federal employer identification numbers ("FEIN"); and

     ii.     Using the collected payroll tax funds to: (1) pay for services to be rendered by PSI to Paradyme in the ordinary course of business; (2) pay all of unsecured creditors of Presidion; and (3) refinance the secured creditors of Presidion (collectively the "PBS Plan").

38.     Furthermore, Beyer and Saxon Gilmore advised that the PBS Plan, and the actions taken thereunder, complied with all local, state, and federal laws.

39.     At all times material hereto, Beyer was actively involved in providing counsel relevant to, and directly participating in, the development and implementation of the Sunshine Companies Plan and PBS Plan, in particular:

a.  Beyer completed drafts of bankruptcy petition schedules in or about June 2005, which acknowledged the increasing tax liaibility of PBS and Paradyme in advance of a potential decision to file bankruptcy on behalf of PSI as part of the PBS Plan;

b.  Beyer complied and reviewed an index of all of the documents related to the PBS Plan;

c.  Beyer attended numerous meetings with the Internal Revenue Service to discuss the tax liability of PBS and Paradyme;

d.  Beyer participated in the revision of a narrative describing the Sunshine Companies Plan and PBS Plan;

e.  Beyer reviewed and commented on multiple memorandums of law prepared by professionals retained by Amodeo which analyzed and provided advice as to the legality of the Sunshine Companies Plan and PBS Plan;

f.  In or about July 2006, Beyer attended a mock deposition of Amodeo in preparation of potential depositions in connection with civil proceedings arising out of the Sunshine Companies Plan and PBS Plan, at which time the tax strategy was discussed.

40.     The PBS Plan would allow for accrued tax liabilities to remain with the FEIN of PBS and/or Paradyme, while providing additional funds to enable the PEO operations to continue until the business could pay all of its outstanding liabilities.

41.     Furthermore, as part of the PBS Plan, on July 28, 2005 Wellington subsequently purchased PSI, and in effect the remaining Presidion PEO assets, so as to

preserve the value of the assets, and to maintain Presidion's PEO operations as a viable business in the interim, so that the business would be financially rehabilitated for purposes of a sale to AEM , MVI's subsidiary, at a later date.

42.     Additionally, AEM and PSI entered into an agreement and subsequent amendment whereby AEM would purchase the PEO assets from PSI in December 2005.

43.     In or about August 2005, prior to AEM's planned acquisition of the Presidion PEO assets, AEM entered into a management agreement with PSI wherein it would oversee the processing of the Presidion PEO assets while performing its due diligence (the "Management Agreement").

44.     Pursuant to the Management Agreement, AEM warranted and represented to PSI that WEM would comply with all applicable federal, state, and local laws, rules, and regulations, codes, statutes, ordinances and orders of any governmental or regulatory authority relevant to PBS, Paradyme, and/or the Presidion PEO assets.

45.     During the initial term of the Management Agreement, AEM and Wellington determined that the Presidion PEO assets had a significant amount of previously undisclosed problems and that the Management Agreement would need to be extended until January 2006 to allow AEM an appropriate amount of time to resolve the various problems related to the Presidion PEO assets, which included the inability of AEM to effectively transfer the data and licenses of the Presidion IT system. AEM was required to retain an interest in the Presidion PEO assets because, absent AEM's involvement, Presidion or its management was unable to obtain worker's compensation insurance coverage for its own customer accounts.

46.     In January 2006, AEM discovered that the Presidion PEO assets would not be ready for acquisition until approximately April 2006 as a result of the aforementioned inability of AEM to transfer Presidion's customer data into AEM's IT system.

47.     As a result thereof, during the period beginning January 2006 and ending on or about April 2006, AEM agreed to allow PSI to use AEM's bank accounts to process the payroll of the Presidion PEO assets.

48.     While all payroll tax collections and reporting continued to take place through PBS and/or Paradyme and under the PBS FEIN, the payroll tax payments began to be made under the AEM FEIN, *not the PBS FEIN*. Beginning in March 2006, all tax payments owed by PBS and/or Paradyme, via collection of taxes on the Presidion PEO assets, had ceased.

49.     On or about April 1, 2006, AEM officially acquired the Presidion PEO assets; however, MVI and AEM management subsequently decided to rescind the acquisition of the Presidion PEO assets and to continue under the Management Agreement to allow them additional time to re-evaluate the Presidion PEO assets and terminate unprofitable clients.

50.     During the Sunshine Companies Plan, Amodeo sought and received legal and tax advice from various professionals, particularly Defendants, which provided, in pertinent part, that any tax liabilities incurred by a subsidiary would remain with that subsidiary and such liability would not attach to the detriment of the parent company or affiliated subsidiaries such as MVI and AEM pursuant to a strict silo theory of tax liability.

51.     Defendants were actively engaged in, and a part of, Amodeo's

development of the PBS Plan.

52. During this two (2) day development of the PBS Plan, it was expressly discussed between Amodeo, Defendants, Rachlin, and various other professionals that collected payroll "trust fund" tax deposits would be used to fund the worker's compensation collateral requests so as to ensure continuing coverage.

53. The PBS Plan would allow for accrued tax liabilities to remain with the FEIN of PBS and/or Paradyme, while providing additional funds to enable PEO operations to continue until the business was restored to a position wherein it could pay all of its outstanding liabilities.

54. Moreover, prior to, during, and after the implementation of the PBS Plan, Amodeo sought professional advice and counsel from Defendants as to what, if any, personal civil or criminal liability may arise or inure to the detriment of Amodeo or MVI, its subsidiaries and related companies by engaging in the PBS Plan.

55. Defendants advised Amodeo that the PBS Plan, and all actions in connection therewith, complied with all local, state, and federal laws.

56. At all times material hereto, Defendants were actively involved in providing advice relevant to, and directly participating in, the development and implementation of the Sunshine Companies Plan and PBS Plan, in particular:

    a. Defendants attended numerous meetings with the Internal Revenue Service, on behalf of MVI, its subsidiaries and related companies, PSI, the Sunshine Companies, PBS, and Paradyme, in which the non-payment of payroll "trust fund" taxes was discussed;

b. Defendants assisted in answering questions asked to MVI, its subsidiaries and related companies, PSI, the Sunshine Companies, PBS, and Paradyme by the District Counsel for the Plantation Office;

c. Berman participated in the drafting and revision of a narrative describing the Sunshine Companies Plan and PBS Plan;

d. Defendants prepared and researched three memorandums of law which analyzed and provided advice related to the potential consequences of the Sunshine Companies Plan and PBS Plan, including: (i) the April 2005 Memo; (ii) a memo discussing the respective priority of perfected liens and taxes pursuant to the Federal Tax Lien Act; and (iii) a memo discussing the ramifications of the Debt Refinancing Agreement between PSI and MVI, its subsidiaries and related companies;

e. In or about July 2006, Berman conducted a mock deposition of Amodeo in preparation of potential depositions in connection with civil proceedings arising out of the Sunshine Companies Plan and PBS Plan, specifically with regard to the tax strategy employed (the "Mock Deposition").

57. During and after the Mock Deposition, concerns were raised by various professionals, not a party to the development of the Sunshine Companies Plan the PBS Plan or MVI, its subsidiaries and related companies' role, regarding the legality of the same.

58. Particularly, during a break in the Mock Deposition, Daniel Barks

("Barks"), an attorney retained by MVI, privately approached Berman and Holtz about problems and potential illegalities he perceived resulting from the Sunshine Companies Plan and PBS Plan and MVI, its subsidiaries and related companies' operations.

59.     Berman and Holtz convinced and persuaded Barks that the Sunshine Companies Plan, the PBS Plan and MVI's operations, and all actions taken in connection therewith, were reasonable and complied with all local, state, and federal laws.

60.     Berman did not inform MVI of Barks' concerns.

61.     Subsequent to the Mock Deposition, Berman and Holtz requested that Amodeo destroy all audio, video, and transcribed recordings of the Mock Deposition, and coached Amodeo on how to answer questions related to the Sunshine Companies Plan, the PBS Plan and MVI's operations so that it would not appear as if illegal acts relevant to racketeering had taken place in connection therewith.

62.     At all times material hereto, Defendants failed to advise MVI that persons with the authority to exercise significant control over the financial affairs of a company have a statutory duty to collect, withhold, truthfully account for, and pay over payroll "trust fund" taxes and that failure to intervene to stop and/or mitigate the nonpayment of collected payroll "trust fund" taxes collected could result in significant liability, particularly criminal liability, despite multiple requests from Amodeo as to the potential consequences of the Sunshine Companies Plan and PBS Plan and all MVI operations.

63.     At all times material hereto, MVI was never advised that criminal liability may result from the actions taken in connection with the Sunshine Companies Plan, PBS Plan or MVI's operations.

64.     As opposed to advising MVI of the aforementioned criminal liability potentially resulting from the Sunshine Companies Plan, PBS Plan and all of MVI's operations, and resigning/terminating their representation if MVI, its subsidiaries and related companies did not cease what could be potentially illegal conduct, Defendants chose to instead obtain a direct pecuniary interest from their representation of MVI, its subsidiaries and related companies.

65.     Particularly, Beyer was the direct beneficiary of significant amounts of compensation and consideration flowing from the Sunshine Companies Plan and PBS Plan and the resulting unpaid payroll "trust fund" taxes of PSI, PBS, and Paradyme, including:

      a.   Beyer became an officer and employee of Mirabilis Ventures, Inc. ("Mirabilis"), a company which received approximately $72,726,446 from PSI and Amodeo through direct investments and loans; and

      b.   Beyer received approximately $9,643,674.19 from PSI and Amodeo, towards projects in which he had a potential direct economic benefit.

66.     In or about September 2006, the Internal Revenue Service and United States Attorney's Office for the Middle District of Florida begin investigating Amodeo, Presidion, PSI, and others for potential civil and criminal liability arising from the alleged evasion of payment of taxes in connection with the Sunshine Companies Plan and PBS Plan.

67.     Pursuant to the doctrine of respondeat superior, BIR and Saxon Gilmore

are vicariously liable to MVI, its subsidiaries and related companies for the actions of its agent, Beyer.

## COUNT I – NEGLIGENCE

68.     MVI hereby reasserts by reference in this Count I the allegations of Paragraphs 1 through 67 of this Complaint as if fully set forth herein.

69.     At all times material hereto, an attorney-client relationship existed between MVI and Defendants.

70.     By accepting employment to render legal advice to MVI, Defendants had a duty to use such skill, prudence, and diligence as other attorneys of ordinary skill and capacity commonly possess and exercise in the performance of the tasks they undertake.

71.     Defendants breached their aforementioned duties and deviated from the applicable standards of professional care, by virtue of their conduct described hereinabove, particularly, Defendants failed to advise MVI, its subsidiaries and related companies that the Sunshine Companies Plan, PBS Plan and MVI's operations could result in criminal liability for MVI, its subsidiaries and related companies.  Defendants failed to inform MVI that concerns were raised by the USAO for South Florida and various other professionals about the legality of the Sunshine Companies Plan, PBS Plan and MVI's operations; and Defendants failed to follow the instructions of MVI when requested on multiple occasions that Defendants contact the USAO for South Florida regarding the potential consequences of the Sunshine Companies Plan, PBS Plan and MVI's operations or failed to inform MVI of the USAO's response.

72.     As a direct and proximate result of Defendants' negligence, MVI, its

subsidiaries and related companies have suffered damage to its business, property, as well as its creditors, and accordingly seeks compensatory damages in an amount in excess of $200,000,000.00.

## COUNT II – BREACH OF FIDUCIARY DUTY AND SELF-DEALING

73.     MVI hereby reasserts by reference in this Count II the allegations of Paragraphs 1 through 67 of this Complaint as if fully set forth herein.

74.     At all times material hereto, a fiduciary relationship existed between MVI, its subsidiaries and related companies and Defendants, particularly, an attorney-client relationship existed between MVI, its subsidiaries and related companies and Defendants.

75.     Defendants each breached their fiduciary duties to MVI, its subsidiaries and related companies by virtue of their conduct described hereinabove, particularly, Defendants each failed to advise MVI that entities with the authority to exercise significant control over the financial affairs of a company have a statutory duty to collect, withhold, truthfully account for, and pay over payroll "trust fund" taxes and that failure to intervene to stop and/or mitigate the nonpayment of collected payroll "trust fund" taxes collected could result in significant liability, particularly criminal liability, despite multiple requests from MVI as to the potential consequences of the Sunshine Companies Plan, PBS Plan and MVI's operations; Defendants failed to inform MVI that concerns were raised by the USAO for South Florida and various other professionals about the legality of the Sunshine Companies Plan, PBS Plan and MVI's operations; and Defendants failed to follow the instructions of MVI when requested on multiple occasions that Defendants contact the USAO for South Florida regarding the potential

consequences of the Sunshine Companies Plan, PBS Plan or MVI's operations or failed to inform MVI of the USAO's response.

76.     Additionally, Defendants' breach of their fiduciary duties allowed Beyer to confer a benefit upon himself in a private capacity.

77.     As a direct and proximate result of Defendants' breach of fiduciary duties and self-dealing, MVI, its subsidiaries and related companies has been damaged in his business and property and accordingly seeks compensatory damages in excess of $200,000,000.00.

**COUNT III**
**NEGLIGENT MISREPRESENTATION**

78.     Cuthill incorporates paragraphs 1 through 67 of the Complaint as if fully set forth herein.

79.     This Court is a cause of action against Defendants for negligent misrepresentation.

80.     Defendants knew, or should have known, that MVI, its subsidiaries and related companies were relying on the information supplied and representations and statements made by Defendants in connection with their legal representation of MVI's entities in deciding how to run and operate its businesses.

81.     Defendants owed MVI, its subsidiaries and related companies a duty of reasonable care, skill and diligence to ensure that all of the information supplied and representations and statements made to or on behalf of MVI and its related entities were true and accurate.  This duty required Defendants to reasonably investigate the facts pertinent to the representation and provide MVI and its related entities with true and accurate information in connection with their legal representation.

82. Defendants breached their duty by making the material negligent misrepresentations and omissions described above when in the exercise of reasonable care should have known facts or circumstances indicating that these negligent misrepresentations and omissions were materially misleading at the time they were made.

83. As a direct and proximate result of the negligent misrepresentations made by Defendants, MVI, its subsidiaries and related companies have suffered damages of over $200,000,000.00, exclusive of interest, attorneys' fees and costs.

WHEREFORE, Cuthill demands judgment against Defendants: (1) awarding compensatory damages for all harm suffered as a result of their negligent misrepresentations; (2) awarding prejudgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

## COUNT IV
## PROFESSIONAL NEGLIGENCE

84. Cuthill incorporates paragraphs 1 through 67 of the Complaint as if fully set forth herein.

85. This Count is a cause of action against Defendants for professional negligence.

86. As a result of their legal representation of MVI, its subsidiaries and related companies Defendants knew or should have known, that MVI, its entities were relying on their work product, representations, and statements in deciding how to operate and conduct its businesses.

87. Defendants owed a duty to MVI, its subsidiaries and related companies to exercise reasonable care, skill, and diligence in order to ensure that all of the information

obtained and supplied to MVI, in connection with their legal representation, was true and accurate.

88.     Defendants breached their duty of care by making the misrepresentations and omissions described above when, in the exercise of reasonable care, they should have known that these misrepresentations were misleading at the time they were made.

89.     As a direct and proximate result of the professional negligence of Defendants, MVI, its subsidiaries and related companies have suffered damages in excess of $200,000,000.00, exclusive of interest, attorneys' fees, and costs.

WHEREFORE, Cuthill demands judgment against Defendants awarding compensatory damages for all harm suffered as a result of their professional negligence; awarding prejudgment interest at the maximum rate allowed by law; awarding court costs; and awarding any other relief this Court deems appropriate.

## COUNT V
## NEGLIGENT SUPERVISION

90.     Cuthill incorporates paragraphs 1 through 67 of the Complaint as if fully set forth herein.

91.     This Count is a cause of action against BIR and Saxon Gilmore for the negligent supervision of Beyer.

92.     BIR and Saxon Gilmore owed MVI, its subsidiaries and related companies a duty to use reasonable care in supervising the conduct and activities of Beyer in connection with their representation of MVI, its subsidiaries and related companies.

93.     BIR and Saxon Gilmore breached their duty of reasonable care by failing to supervise Beyer to ensure that his conduct and activities were not fraudulent or

deceptive and that all of his work product and representations on behalf of MVI were true and accurate.

94. BIR and Saxon Gilmore also breached their duty of reasonable care by failing to supervise the trust account of MVI and its related entities.

95. As a direct and proximate result of this breach, MVI has suffered damages in excess of $200,000,000.00 exclusive of interest, attorneys' fees and costs.

WHEREFORE, Cuthill demands judgment against BIR and Saxon Gilmore: (1) awarding compensatory damages for all harm suffered as a result of its negligent supervision of MVI; (2) awarding prejudgment interest at the maximum rate allowed by law; (3) awarding court costs; and (4) awarding any other relief this Court deems appropriate.

/s/Elizabeth A. Green
Elizabeth A. Green
Florida Bar No. 0600547
Jennifer S. Eden
Florida Bar No. 0867594
Jimmy D. Parrish
Florida Bar No. 526401
Latham, Shuker, Eden & Beaudine, LLP
390 North Orange Avenue, Suite 600
Orlando, Florida 32801
Telephone: (407) 481-5800
Facsimile: (407) 481-5801
Attorneys for Debtor/Plaintiff