UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re:

MIRABILIS VENTURES, INC.,

Debtor.

Case No.: 6:08-bk-04327-KSJ

Chapter 11

MIRABILIS VENTURES, INC.,

      Plaintiff,

v.

BUCHANAN, INGERSOLL &
ROONEY, P.C.; SAXON, GILMORE,
CARRAWAY, GIBBONS, LASH &
WILCOX, P.A. and HANS C. BEYER,

      Defendants.

Adv. Proceeding No.: 6:08-ap-00227-KSJ

**MOTION TO DISMISS AND
INCORPORATED MEMORANDUM
OF LAW OF DEFENDANTS
BUCHANAN INGERSOLL &
ROONEY P.C. AND HANS C. BEYER**

**(1 hour oral argument requested)**

      Buchanan Ingersoll & Rooney P.C. ("BIR") and Hans Beyer, a former BIR employee (collectively "BIR Defendants"), per Federal Rule of Bankruptcy Procedure 7012(b), request this Court dismiss debtor-in-possession Plaintiff's ("MVI") Complaint (Bankr. Adv. Doc. "BAD" 1) for failure to state a claim upon which relief may be granted, and state as follows:

## I. INTRODUCTION

      MVI seeks over $200,000,000 from two separate law firms and one lawyer for alleged legal malpractice during two separate debt-restructuring plans. A precondition to legal malpractice liability is the existence of an attorney-client relationship. With vague and misordered allegations and by grouping each defendant into an undifferentiated class of "Defendants," MVI obscures facts showing: that different persons, allegedly acted at different times, and in different capacities; and that a separate individual, different from MVI, allegedly

retained the BIR Defendants for advice as to a separate plan, in which MVI played no part. In that regard, the Complaint reveals an absence of reasonable inquiry or belief and an effort to use confusion to perpetuate deficient claims against the BIR Defendants. Based on alleged legal advice it was in no legal position to rely upon, MVI has asserted a dizzying morass of allegations that fall well short of MVI's pleading burdens. Indeed, the Complaint is fatally flawed and should be dismissed with prejudice.

## II. **BACKGROUND**

The Complaint asserts five counts essentially for legal malpractice against BIR and Saxon, Gilmore, Caraway, Gibbons, Lash & Wilcox, P.A. ("Saxon Gilmore"), and against an attorney, Beyer, who those law firms employed at different times. Each count is a variant of the claim that "Defendants" gave (or failed to curb) bad or self-interested legal advice, and MVI allegedly suffered over $200,000,000 in damages as a result. To reach that conclusion, each count incorporates 67 paragraphs of allegedly supportive allegations.

One, if not the, central character in the Complaint is Frank Amodeo, who is introduced as an individual "the Presidion Corporation, a publicly-traded company, and its affiliates and subsidiaries (collectively 'Presidion')" approached "in or about August 2004," "regarding developing and implementing a plan of reorganization." (BAD 1 ¶13). Presidion, at the time, allegedly owed over $55 million, mostly in federal payroll tax liabilities for staff-leasing subsidiaries, including four entities called the "Sunshine Companies." (*Id.* ¶14).

### A. **The Sunshine Companies Plan**

The "Sunshine Companies Plan" is described as a strategy Amodeo proposed for Presidion to deconsolidate, divest, and liquidate the Sunshine Companies; use the proceeds

2

to pay the Internal Revenue Service ("IRS"); and allow Presidion to continue as a going concern by "separat[ing] itself from the excessive liabilities associated with its subsidiaries." (*Id.* ¶¶15-17). In practice, the Sunshine Companies Plan would be carried out by Wellington Capital Group, Inc. ("Wellington"), a company wholly owned by Amodeo. Wellington would purchase the Sunshine Companies from Presidion, dissolve them, liquidate their remaining assets, and pay the proceeds over to the IRS. (*Id.* ¶21). Amodeo allegedly began to implement the Sunshine Companies Plan in or about December 2004 (*id.* ¶21); and he successfully completed that plan in or about April 2005, with unspecified help from AQMI (*id.* ¶33), a consulting organization also wholly owned by Amodeo (*see id.* ¶¶30, 35).

### B.  The PBS Plan

The Complaint uses labels "PBS Plan" and "PSI" in repeated references to a second plan, involving different Presidion subsidiaries from the Sunshine Companies. PSI is a short-form label for Presidion Solutions Inc., a Presidion subsidiary. (*Id.* ¶30).

Amodeo and AQMI allegedly developed the "PBS Plan" for Presidion to preserve, restore, and maximize the value of Presidion's Professional Employer Organization ("PEO") assets, "including two subsidiaries of PSI known as Professional Benefits Solutions, Inc. ('PBS') and Paradyme, Inc. ('Paradyme')." (*Id.* ¶31). Under the PBS Plan, PSI was to (i) account for and report PBS's and Paradyme's payroll tax withholdings; but (ii) use those funds to pay PSI for services, to pay Presidion's unsecured creditors, and to refinance Presidion's secured creditors. (*Id.* ¶37). In developing the PBS Plan, it was discussed "that payroll 'trust fund' tax deposits would be used to fund the worker's compensation collateral requests so as to ensure continuing coverage." (*Id.* ¶52). Amodeo, with alleged assistance from various

professionals, developed the PBS Plan "[d]uring *this* two (2) day" period, for which the Complaint provides no explicit dates. (*Id*.) (emphasis added).

Evidently, the first action taken to implement the PBS Plan was Wellington's purchase of PSI, and thus Presidion's PEO assets, on July 28, 2005. (*Id.* ¶41). This was done as an interim step to keep the PEO assets operating, in anticipation of a later sale to AEM. (*Id.*) Earlier, in June 2005, MVI had allegedly "decided to acquire" a "PEO shell company" called AEM, to prepare for an eventual acquisition of the Presidion PEO assets. (*Id*. ¶36). Yet AEM apparently was not in a position to purchase PSI, when Wellington did so on July 28, 2005. On an unspecified date after MVI acquired AEM, AEM entered an agreement with PSI to purchase the PEO assets in December 2005. (*Id*. ¶42).

In August 2006, AEM entered an interim "Management Agreement," whereby AEM managed the PEO assets during a due diligence review. (*Id*. ¶43). AEM and Wellington later discovered significant undisclosed problems with the PEO assets, which hindered their transfer and prompted AEM to delay the purchase and extend the Management Agreement. (*Id.* ¶45). During the delay, which extended from January until April 2006, AEM allowed PSI to process payroll through AEM's bank accounts; payroll tax payments began to be made "under the AEM FEIN, *not the PBS FEIN*"; and payments to the IRS from taxes withheld by PBS and Paradyme ceased in March 2006. (*Id*. ¶¶46-48) (emphasis in original). On April 1, 2006, AEM officially purchased the PEO assets. (*Id*. ¶49).

Legal problems later ensued, in or about September 2006, when the IRS and the U.S. Attorney's Office began "investigating Amodeo, Presidion, PSI, and others for potential civil and criminal liability arising from the alleged evasion of payment of taxes in connection with

4

the Sunshine Companies Plan and PBS Plan." (*Id.* ¶66). The Complaint does not, however, specify the nature of the tax liabilities or reveal, for instance, the fact that Amodeo was indicted and has pleaded guilty to crimes involving federal tax evasion.

### C. The "Defendants," "Professionals," And Alleged Legal Malpractice

In regard to the foregoing sequence of events, Beyer is originally introduced as being "at all times material ... an agent of ***either*** Defendant BIR ***or*** Saxon Gilmore," who are said to be "liable for all acts, representations, and omissions made by Beyer in connection with his representation of MVI, its related companies and subsidiaries including AEM ***when*** Beyer was employed by each firm." (*Id.* ¶7) (emphasis added). As to Beyer's employment with the respective law firms, the Complaint mentions that Beyer ***left BIR in March 2005*** to join Saxon Gilmore. (*Id.* ¶25). The Complaint further mentions that Beyer became an officer and employee of MVI, on some unspecified date. (*Id.* ¶65a).

According to the Complaint, Amodeo initially retained Beyer (and thus BIR), in or about November 2004, "to represent and advise ***Amodeo*** as to the implications and potential consequences resulting from the Sunshine Companies Plan." (*Id.* ¶19) (emphasis added). Amodeo also allegedly sought such advice from accountants and other attorneys. (*Id.* ¶18).

Repeated references are made to a group of various "professionals," (*See id.* ¶¶18, 23, 34, 37, 50, 52, 57). They are specified, at points, to include an individual called "Berman," (*id.* ¶¶8, 12, 34, 56, 58, 59, 60, 61); an entity, "BKR," which employed Berman, (*id.* ¶¶8, 34); individuals or entities called "Riguera" and "Wildermuth," (*id.* ¶34); an individual or entity called "Rachlin," (*id.* ¶52); and an individual called "Holtz," (*id.* ¶58, 59, 60). And, at least one of them or the indefinite group, virtually always is identified alongside "Defendants" in

relation to conduct. Indeed, the Complaint goes so far as to reference Berman as if he were one of the named "Defendants" in this adversary proceeding. (*See id.* ¶¶8, 12, 56).

The advice Amodeo allegedly sought and received is described, "in pertinent part," as an opinion that, "pursuant to a strict silo theory of tax liability," "any tax liabilities incurred by a subsidiary would remain with that subsidiary and such liability would not attach to the detriment of the parent company or affiliated subsidiaries" (the "Alleged Silo Advice"). (*Id.* ¶¶23, 50). "Various professionals, particularly Defendants," supposedly gave the Alleged Silo Advice to "Amodeo," "[d]uring the Sunshine Companies Plan." (*See id.*)

In that regard, "professionals retained by Amodeo, including Beyer and [BIR]" are said to have validated the Alleged Silo Advice with "[e]xtensive legal research and written legal opinions." (*Id.* ¶24). The Complaint later specifies that "three memorandums of law" were prepared and researched, "including: (i) the April 2005 Memo; (ii) a memo discussing tax-lien priority; and (iii) a memo discussing the ramifications of the Debt Refinancing Agreement between PSI and MVI, its subsidiaries [etc.]."(*Id.* ¶56d). While those alleged legal memoranda are described only once in those explicit terms, the relative timing and participants to them can, nevertheless, be sieved from other allegations in the Complaint.

Beyer's and BIR's alleged liability appear premised on or linked to the acts of others. For Beyer, liability is premised on after-the-fact or collateral participation following other "professionals" conduct. For BIR, liability is premised on BIR having to answer for Beyer's conduct, under a *respondeat superior* theory. (*Id.* ¶¶7, 67). The timing and nature of alleged culpability are evident from the following allegations about Defendants' and Beyer's "particular" involvement in regard to "the Sunshine Companies Plan and PBS Plan":

| Defendants' "particular" involvement | Beyer's "particular" involvement |
|---|---|
| | Beyer completed drafts of bankruptcy petition schedules [for PSI, PBS, and/or Paradyme] in or about **June 2005**...[(*id.* ¶39a) (emphasis added)]; |
| | Beyer **compiled and reviewed** an index of all of the **documents related to _the PBS Plan_** [(*id.*¶39b) (emphasis added)]; |
| Defendants attended numerous meetings with the [IRS], on behalf of MVI, its subsidiaries and related companies, PSI, the Sunshine Companies, PBS, and Paradyme, in which the non payment of payroll "trust fund" taxes was discussed [(*id.* ¶56a)]; | Beyer attended numerous meetings with the [IRS] **to discuss** the tax liability of **_PBS and Paradyme_** [(*id.* ¶39c) (emphasis added)]; |
| Defendants assisted in answering questions asked to MVI, its subsidiaries and related companies, PSI, the Sunshine Companies, PBS, and Paradyme by [IRS] District Counsel ... [(*id.* ¶56b)]; | [see above] |
| **Berman** participated in the **_drafting and revision of a narrative_** describing the Sunshine Companies Plan and PBS Plan [(*id.* ¶56c) (emphasis added)] | Beyer participated in the **_revision of a narrative describing_** the Sunshine Companies Plan **and PBS Plan** [(*id.* ¶39d) (emphasis added)]; |
| Defendants prepared and researched **_three memorandums of law_** which analyzed and provided advice related to the potential consequences of the Sunshine Companies Plan and PBS Plan, **_including (i) the April 2005 Memo_**; **(ii)** [the tax-lien priority memo]; and **(iii)** **_a memo_** [regarding] the Debt Refinancing Agreement between **_PSI and MVI_**, its subsidiaries and related companies [(*id.*¶56d) (emphasis added)]; | Beyer **_reviewed and commented on_** multiple **_memorandums of law_** prepared by professionals retained by Amodeo which analyzed and provided advice as to the legality of the Sunshine Companies Plan and PBS Plan, (*id.* ¶39e) (emphasis added); [and] |
| In or about **_July 2006_**, **Berman _conducted_** a mock deposition of Amodeo in preparation for potential depositions in connection with civil proceedings arising out of the Sunshine Companies Plan and PBS plan ... [(*id.*¶56e) (emphasis added)]; | In or about **_July 2006_**, Beyer **_attended_** a mock deposition of Amodeo in preparation for potential depositions in connection with civil proceedings arising out of the Sunshine Companies Plan and PBS plan ... [(*id.* ¶39e) (emphasis added)]. |

7

Thus, Beyer's alleged review and comments on some or all of three legal memoranda that other professionals prepared are the evident bases for the charge that "***Beyer and [BIR]*** advised that ***the Sunshine Companies Plan***, and the actions taken thereunder, complied with all local, state, and federal laws." (*Id.* ¶22; *compare with* ¶¶56d, 39e) (emphasis added). By comparison, evidently because Beyer's part in the PBS Plan (if not the PBS Plan, itself) occurred ***after he left BIR*** in March 2005, the allegations evolve to say that "***Beyer and Saxon Gilmore*** advised ***the PBS Plan***, and the actions taken thereunder, complied with all local, state, and federal laws," (*Id.* ¶38; *compare with id*. ¶¶25, 39) (emphasis added).

The Complaint then accuses Berman (evidently again as one of the Defendants) of covering up concerns Daniel Barks, an attorney retained by MVI, raised in regard to the Sunshine Companies Plan and the PBS Plan, at the time of Amodeo's "mock deposition" in July 2006, ***some 16 months after Beyer left BIR***. (Id. ¶¶57-60). Berman later allegedly instructed Amodeo to destroy potentially damaging materials and coached Amodeo to answer investigative questions so that it would not appear as if illegal acts had taken place. (*Id.* ¶61). Yet neither BIR, Saxon Gilmore, nor even Beyer is referenced in regard to that activity.

The Complaint finally premises liability on the allegation that "***Defendants*** failed to advise MVI that persons with authority to exercise significant control over the financial affairs of a company have a statutory duty to collect, withhold, truthfully account for, and pay over payroll "trust fund" taxes ..." (*Id.* ¶62) (emphasis added). Rather than advise MVI of potential criminal liability in that regard, "***Defendants***" allegedly "chose to obtain a direct pecuniary interest from their representation of MVI, its subsidiaries and related companies."(*See generally*, *id*. ¶¶64-65) (emphasis added).

8

### III. **STANDARD OF REVIEW**

Largely groundless claims should be exposed "at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1966 (2007) (quotation omitted). Discovery in complex federal cases can be enormously expensive, and courts must be conscious of this reality so as to avoid situations in which plaintiffs use the threat of such expense to push defendants "to settle even anemic cases." *Id.* at 1967. Early resolution is appropriate where a plaintiff's cause of action is simply not plausible. *Id.* at 1974.

A complaint must contain, at a minimum, allegations giving fair notice of what the plaintiff's claim is and the grounds that support it, including "factual allegations adequate to raise a right to relief above a speculative level." *Financial Sec. Assur. Inc. v. Stephens Inc.*, 500 F.3d 1276, 1282 (11th Cir. 2008) (citing *Twombly*). The "obligation to provide the 'grounds' of [an] 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 127 S.Ct. at 1964-65. Conclusory allegations, unwarranted factual deductions, and conclusions of law need not be accepted as true and such allegations, masquerading as facts, will not prevent dismissal. *Wagner v. Daewoo Heavy Indus. Am. Corp.*, 289 F.3d 1268, 1271 *aff'd in relevant part en banc* 314 F.3d 541 (11th Cir. 2002); *Oxford Asset Mgmt., Ltd. v. Jaharis,* 297 F.3d 1182, 1188 (11th Cir. 2002). Without resorting to such illegitimate means, "the factual allegations in a complaint must 'possess enough heft' to set forth 'a plausible entitlement to relief.'" *Financial Sec. Assur. Inc.*, 500 F.3d at 1282. Dismissal under Rule 12(b)(6) is proper where a claim suffers from a dispositive legal flaw, or where the facts alleged simply cannot

support an element of the claim. *Aldridge v. Lily-Tulip, Inc. Salary Retirement Plan Benefits Comm.,* 953 F.2d 587, 593 (11th Cir. 1992).

## IV. <u>ANALYSIS</u>

All counts in the Complaint trace back to the notion that Defendants either gave negligent legal advice or failed to warn of consequences associated with essentially raiding a payroll tax "trust fund." (*Id.* ¶¶70, 75, 80-82, 86-88, 91-93) (revealing attorney-client bases for Counts I - V, respectively). At issue, therefore, is whether the Complaint states a claim for legal malpractice against the BIR Defendants – the "three essential elements" of which are: "(1) that the defendant attorney was employed by the plaintiff [to render legal services]; (2) that the defendant attorney neglected a reasonable duty owed to the plaintiff; and (3) that such negligence was the proximate cause of loss to the plaintiff." *Jackson v. Bellsouth Telecomm.*, 372 F.3d 1250, 1281 (11th Cir. 2004) (citation omitted).

> **A.     MVI Has Not And Evidently Cannot Allege The Necessary Attorney-Client Relationship Required For Liability.**

Florida law generally limits professional liability of attorneys only to persons with whom they share privity of contract. *Id.* Simply put, there must be an actual attorney-client relationship before an attorney can be held liable for failing to conform to the high standards required of such a relationship.

The privity rule has only been relaxed where it was a client's manifest intent to directly benefit a third party, such as the case of a will beneficiary; <u>incidental</u> third-party beneficiaries are not included in this exception. *Angel, Cohen and Rogovin v. Oberon Inv.*, N.V., 512 So.2d 192, 194 (Fla. 1987). A third party may be classified as a beneficiary for these purposes "only

if the parties to the contract clearly express, or the contract itself expresses, an intent to **_primarily and directly_** benefit the third party." *Jackson*, 372 F.3d at 1283 (emphasis added).

> **i.** **Privity or beneficiary status cannot properly be alleged through group pleading and conflating events, as MVI has done.**

MVI repeatedly concludes that it had an attorney-client relationship with "Defendants." (*Id.* ¶¶69, 74, 80, 86, 92). Yet the allegations supposedly supporting such conclusions are unintelligibly mixed and often contradictory.

Rule 8(a)(2)'s requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief," necessitates fair, individualized notice of the grounds for each defendant's alleged liability. *See* FED. R. BANKR. P. 7008(a). Federal courts have repeatedly held that, where a complaint "lumps" separate and distinct defendants together and fails to distinguish their different roles or conduct, it violates Rule 8 and should be dismissed. *See, e.g., Atuahene v. City of Hartford*, 10 Fed. Appx. 33, 34 (2nd Cir. 2001) ("[b]y lumping all the defendants together in each claim and providing no factual basis to distinguish their conduct, plaintiff's complaint failed to satisfy [Rule 8's] minimum standard"); *Court Appointed Receiver of Lancer Offshore, Inc. v. Citco Group, Ltd.*, 2008 WL 926512, *3 (S.D. Fla. 2008) (complaint dismissed where plaintiff lumped three distinct defendants together and failed to articulate what alleged acts or duties were attributable to each defendant).[1]

---

[1]Other cases include: *Rice v. Federal Bureau of Investigation*, 2006 WL 3837460, *1 (M.D. Fla. 2006) (pro se complaint dismissed that failed to allege violations of each defendant and failed to differentiate by time, place and manner each defendant's role in the alleged conspiracy); *Lane v. Capital Acquisitions and Mgmt. Co.*, 2006 WL 4590705, *5 (S.D. Fla. 2006) (complaint dismissed where plaintiff failed to differentiate among five individual and corporate defendants, alleging instead violations by collective defendant; by lumping all defendants together in each claim and providing no factual basis to distinguish their conduct, complaint failed to satisfy the minimum standard of Rule 8); *Classen Immunotherapies, Inc. v. Biogen Idec*, 381 F.Supp.2d 452, 455 (D. Md. 2005) (complaint dismissed where plaintiff referred to five defendants collectively; by failing to delineate the particular acts of infringement attributable to each defendant, complaint did not provide facts sufficient to inform defendant of basis for plaintiff's claims); *Appalachian Enters., Inc. v. Epayment Solutions,*

As regards BIR and Beyer (in his former capacity as a BIR employee), they are dragged into a confusing patchwork of allegations, from which this thread is drawn:

| | Explicitly Dated Allegations | Allegations Not Explicitly Dated |
|---|---|---|
| 11/04 | *Amodeo* retained BIR and Beyer for advice as to *the Sunshine Companies Plan*, (BAD 1 ¶19); | |
| 12/04 | *Amodeo* begins process wherein Wellington, an entity he wholly owns, buys the Sunshine Companies for Presidion and liquidates them, (*id.* ¶21); | "During the Sunshine Companies Plan, *Amodeo* sought and received [the Alleged Silo Advice] from various professionals ...," (*id.* ¶23) (emphasis added); |
| 3/05 | *Beyer leaves BIR*, (*id.* ¶25); | |
| 4/05 | *Amodeo* completes the Sunshine Companies Plan, (*id.* ¶33); | *Defendants* issue first of three memoranda discussed below, (*see id.* ¶56d); |
| 6/05 | *MVI acquires AEM* (*id.* ¶36); | |
| 7/05 | As part of the PBS plan, *Wellington buys PSI* to preserve the remaining PEO assets for later sale to AEM, (*id.* ¶41); | Amodeo proposed *the PBS Plan*, (*id.* ¶37); "[d]uring this two (2) day development of the PBS Plan" Amodeo, *Defendants*, and various other professionals discuss the use of PBS's payroll taxes to maintain worker's comp. coverage, (*id.* ¶52); |
| | | *Beyer* reviewed legal memoranda "prepared by professional retained by Amodeo," (*id.* ¶39e); total of **three** were prepared and researched by *Defendants* as to *the Sunshine Companies Plan **and** PBS Plan*, (*id.* ¶56d) (compare above); |
| 08/05 | AEM and PSI enter agreement for *AEM to oversee PEO-asset operations*, (*id.* ¶43); | *AEM* and PSI enter agreement for AEM *to purchase the PEO assets in December 2005*, (*id.* ¶42); |

*Ltd.,* 2004 WL 2813121, *7 (S.D.N.Y. 2004) (Rule 8 not satisfied when complaint "lumps all the defendants together and fails to distinguish their conduct because such allegations fail to give adequate notice to defendants as to what they did wrong.")

| | | In apparent error, tax payments related to PBS's payroll tax liabilities were "made under the AEM FEIN, *not the PBS FEIN*," (*id*. ¶48) (emphasis in original); |
| --- | --- | --- |
| 06/06 | federal authorities launch investigation, (*id*. ¶66); | MVI discovers that diversion of payroll taxes can cause criminal liability, (*id*. ¶62) |

Here, even after excluding a mass of contorted irrelevancies and repetition, the Complaint still impermissibly lumps the BIR Defendants with a group of named and unnamed "Defendants" that includes Berman, Saxon Gilmore, and other professionals. Yet far more vexatious is the manner in which the Complaint glosses over the legal distinctions among individuals and separate entities, and how it conflates different non-contemporaneous events as to which actors: have no or different relationships, play no or different roles, or are acting in different capacities, if at all. These deficiencies, while reflected in the foregoing summary, are all the more evident from the larger context detailed in the Background section (above), which reflects a painstaking analysis of the Complaint.

> **ii.      It is evident from the Complaint that MVI cannot properly state a claim against the BIR Defendants.**

For reasons already discussed and further explained below, the BIR Defendants undertook such a painstaking analysis, even though the Complaint is a shotgun pleading[2] with

---

[2] Generally speaking, shotgun pleadings "are those that incorporate every antecedent allegation by reference into each subsequent claim for relief or affirmative defense." *Wagner v. First Horizon Pharmaceutical Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006). Shotgun complaints:

> invariably begin with a long list of general allegations, most of which are immaterial to most of the claims for relief. The general allegations are incorporated by reference into each count of the complaint; the complaint is followed by an answer that responds to each and every statement. If the trial judge does not quickly demand repleader, all is lost – extended and largely aimless discovery will commence, and the trial court will soon be drowned in an uncharted sea of depositions, interrogatories, and affidavits.

*Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.*, 162 F.3d 1290, 1333 (11th Cir. 1998). Such complaints are subject to dismissal under Rule 12(e), on motion or a court's own initiative. *See Byrne v. Nezhat*, 261 F.3d 1075, 1133 (11th Cir. 2001).

impermissible group allegations. Based on that analysis, the following three points reflect the best inferential (not actually pleaded) grounds that MVI might put forward to state a claim against the BIR Defendants, but they reveal that the relationship necessary for professional liability is absent:

**Point 1**: <u>Before he left BIR's employ in March 2005, Beyer possibly reviewed and commented on what became "the April 2005 Memo."</u> (*id*. ¶¶25, 39e, 56d). That date-labeled document, which evidently was not finalized until the month after Beyer left BIR, was the first (and perhaps only) written opinion that might have validated the Alleged Silo Advice. (*Id*. ¶¶23-24). The only other written opinions identified in the Complaint are the tax-lien priority memo and "a memo discussing the ramifications of the Debt Refinancing Agreement between PSI and MVI, its subsidiaries and related companies." (*Id*. ¶56d). Those latter two memoranda surely dealt with the later PBS Plan, because AEM's agreement to purchase the PEO assets in December 2005 is: (i) the only thing the Complaint references that might qualify as "the Debt Refinancing Agreement" between PSI and a subsidiary of MVI;[3] and (ii) it contemplates the only transaction when MVI might have been concerned with tax-lien priority – that is, when its subsidiary (AEM) purchased PEO assets formerly held by PSI's subsidiaries, PBS and Paradyme.[4] (*Compare id.* ¶56d *with id.* ¶42).

---

[3] Indeed, an explicit purpose of the PBS Plan was to refinance secured creditors. (*Id*. ¶37).

[4] A federal tax lien arises following a taxpayer's neglect or refusal to pay taxes, and it attaches to all property belonging to the taxpayer. *See* 26 U.S.C. §6321. Upon the filing of a notice of federal tax lien, such liens have priority against subsequent purchasers and most creditors' after-acquired liens. *See* 26 U.S.C. §6323(a), (f). According to the Complaint, AEM first acquired the PEO assets on April 1, 2006, and tax liabilities were continuously building up in PBS and Paradyme before that time. (BAD 1, ¶39a, 48, 52-53). A tax-lien priority memo would be of little use to AEM unless it was substantially contemporaneous to the purchase of assets to which a tax lien might attach, and such a memo would be of no value before AEM began performing due diligence to determine the timing of any tax assessments and notices of federal tax lien against PBS and Paradyme. AEM allegedly began performing due diligence in or about August 2005. (*Id*. ¶43).

**Point 2**: Whether Beyer reviewed and commented on "the April 2005 Memo" before he left BIR in March 2005, Beyer was retained, if at all, by Amodeo, not MVI. The topic of that document was evidently the Sunshine Companies Plan, for which Amodeo allegedly retained the BIR Defendants. (*Id*. ¶¶19, 22). In April 2005, *Amodeo* successfully completed the Sunshine Companies Plan by having Wellington, *an entity he wholly owned*, buy the Sunshine Companies from Presidion and liquidate them. (*Id*. ¶¶21,33).

**Point 3**: MVI's only alleged contemporaneous link to the BIR Defendants is that MVI allegedly held Presidion stock from January to April 2005 (*id*. ¶¶32, 34) in a period when Beyer may have reviewed and commented on "the April 2005 Memo."

Even taken as true none of these points establish the necessary relationship to support legal malpractice liability. It makes no difference whether MVI was a shareholder of Presidion at the time of the Sunshine Companies Plan, as "an attorney does not become the attorney for the individual stockholders merely because the attorney's actions on behalf of the corporation may also benefit the stockholders." *See Brennan v. Ruffner*, 640 So.2d 143, 145-46 (Fla. 4th DCA 1994) (finding corporation's attorney has no duty to an individual shareholder absent special circumstances or an agreement to represent the shareholder individually).[5] In that regard, Florida courts permit malpractice liability only to those in privity or to a narrowly-defined type of third-party beneficiary. *See id.* at146 (rejecting third-

---

[5] *See also Rudolf v. Gray, Harris & Robinson, P.A.*, 901 So.2d 148, 150 (Fla. 5th DCA 2005) (attorney representing professional association did not owe individual shareholders any duty separate and apart from that owed to association)*; Horowitz v. Laske*, 855 So. 2d 169, 173 (Fla. 5th DCA 2003) (fact that plaintiff was an agent of the client does not establish any duty to the agent on the part of the client's lawyer)*; Chaiken v. Lewis*, 754 So. 2d 118, 119 (Fla. 3d DCA) (counsel for partnership represents partnership entity, not each partner individually), *rev. denied*, 779 So. 2d 270 (Fla. 2000); *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So. 2d 381, 389 (Fla. 4th DCA 1999) (affirming dismissal of malpractice claim brought by shareholders of corporation; attorneys representing corporation are not in privity with individual shareholders).

party beneficiary claim and observing that "Florida has extended [that] exception to the privity requirement in legal malpractice actions to very limited instances, mainly in the area of will drafting..."); *Jackson*, 372 F.3d at 1283 (finding that, under Florida law, the plaintiff must establish that the express intent of the contract was to <u>primarily and directly</u> benefit the plaintiff). Here, MVI cannot hope to establish such preconditions, because MVI was not even a party to the Sunshine Companies Plan, and unmistakable indications in the Complaint are that Amodeo and his wholly owned entities were the only ones involved in implementing that Plan.

MVI's references to later harm flowing from Amodeo's alleged engagement of the BIR Defendants are inapposite. The preconditions to legal malpractice liability – that is, the need for an attorney-client relationship – cannot be avoided.

MVI, for instance, attempts to lay the predicate for a negligent-supervision claim by alleging that "Beyer and [BIR] failed to inform Amodeo that the actual reason for Beyer's departure from [BIR in March 2005] was that Beyer had breached his fiduciary duties to clients by participating in self-dealing ...[and related conduct]." (BAD 1 ¶27). Florida law, however, only recognizes such a supervisory duty where the "plaintiff and defendant are in a relationship in which the defendant has a duty imposed by law to avoid harm to the plaintiff." *Garcia v. Duffy*, 492 So.2d 435, 440 (Fla. 2nd DCA 1986). In that regard, whether such a legal duty exists depends on "the relationship between the employment in question and the particular plaintiff" – particularly, if that relationship is one in which the plaintiff is "within the zone of foreseeable risks created by the employment." *Id.* For legal malpractice, Florida

16

law emphatically limits the zone of foreseeable plaintiffs to clients in contractual privity or particular third-party beneficiaries, of which MVI clearly was not one, as discussed above.

MVI's basic claim appears to be that the BIR Defendants provided Amodeo with the Alleged Silo Advice during the Sunshine Companies Plan, and that advice was extrapolated and applied to later events during the PBS Plan. Yet, the preconditions to legal malpractice liability preclude such an attenuated theory of liability. A fine example of why Florida law limits the scope of liability for legal advice is the allegation in the Complaint that, through some evident error, tax payment on PBS's and/or Paradyme's behalf "began to be made under the AEM FEIN, *not the PBS FEIN*" (BAD 1 ¶48) (emphasis in original). Legal advice virtually always is context specific and subject to change based on different fact scenarios, and the privity and third-party beneficiary limitations effectively limit legal malpractice liability to advice crafted specifically to address the needs of clearly identified persons. The BIR Defendants, if they gave Amodeo advice as to the Sunshine Companies Plan, had no duty to foresee that it might later be used by different parties under different circumstances.

### B. The Complaint Reflects An Absence of Reasonable Inquiry And Belief And An Evident Purpose To Harrass And Oppress The BIR Defendants.

Here, there is ample reason to dismiss the Complaint without reference to matters outside the pleadings. Extrinsic matters, to be sure, are not generally considered in deciding whether to dismiss a complaint. The BIR Defendants submit, however, that the Court should have notice that particularly close scrutiny, if not sanctions, are appropriate in light of the manner in which MVI crafted the Complaint. Merely to request a more definite statement evidently would have been an invitation to further abuse.

17

The BIR Defendants have discovered that Amodeo previously filed a state court complaint against Berman and BKR. (Ex 1, hereto). MVI clearly knew this, as the instant Complaint reflects substantial verbatim reproduction of allegations in Amodeo's complaint. The way in which the Complaint selectively borrows and deviates from Amodeo's complaint reveals that MVI filed the Complaint, at a minimum, without reasonable inquiry and belief.[6]

A key difference is that, while the Complaint names BIR, Saxon Gilmore, and Beyer as "Defendants," Amodeo's complaint names, as "Defendants," "BERMAN, KEAN & RIGUERA, P.A., ('BKR'), and RICHARD E. BERMAN, ('Berman')." (Ex 1, at 1). Yet while MVI is not similarly situated as Amodeo, and BIR and Beyer are not similarly situated as Berman and BKR, the Complaint (despite its own contradicting allegations) proceeds to treat those different individuals and entities as legally indistinguishable.

| Amodeo's complaint v. Berman/BKR | The Instant Complaint |
|---|---|
| In or about **November 2004**, **Amodeo** sought advice as to the Sunshine Companies Plan from "**Defendants**" who he had previously retained, (Ex 1 ¶16); | **Amodeo** retained **BIR and Beyer** in or about **November 2004**, (BAD 1 ¶19); |
| "Defendants" advised Amodeo as to the Sunshine Companies Plan, (*id.* ¶21); | BIR and Beyer advised Amodeo as to the Sunshine Companies Plan, (*id.*, ¶22); |
| | **Beyer left BIR in March 2005**, (*id.* ¶25); |
| | **Amodeo completed** the Sunshine Companies **Plan** in or about **April 2005**, (*id.* ¶33); |

---

[6]MVI, for instance, unjustifiably added the claim that Beyer left BIR under bad circumstances arising from alleged unethical conduct. (BAD 1 ¶27). That claim has no likelihood of yielding any factual support; it is patently false and could only be the product of pure speculation, which would have been easily and directly contradicted by the slightest investigation.

18

| | |
|---|---|
| "Defendants" worked with Amodeo to *develop* the **PBS plan** in a *two-day period following July 28, 2005*, (*id.* ¶¶27, 30). | [After Beyer left BIR] Beyer and Saxon Gilmore advised one or more unspecified persons as to the PBS Plan, (*id.* ¶38). |

Crucial distinguishing features from the Complaint are that Amodeo's complaint reflects a single client, receiving recurrent or continuous representation, by identical defendants in an ongoing employment relationship. Thus, Amodeo's complaint alleges that "Defendants" had continuous active involvement in the Sunshine Companies Plan and PBS Plan. (*See* Ex 1, ¶36).

Despite a clear change in Beyer's employment, MVI proceeded, nevertheless, to "cut and paste" various group allegations into the Complaint, such as that "[a]t all times material hereto, **Defendants** were **actively** involved in...and **directly participated in**...**the Sunshine Companies Plan and PBS Plan**." (*Id.* ¶56) (emphasis added). And against the named Defendants, lumped with "Defendants" also including at least Berman, MVI asserts enormous liability based on the Sunshine Companies Plan **and** PBS Plan, despite allegations showing that Amodeo was the only one who retained counsel for the Sunshine Companies Plan, MVI played no alleged role in that Plan, and BIR played no role in the later PBS Plan.

Rule 9011 has no "cut and paste" exception, and certainly bodes against shotgun pleading. In filing a pleading, "an attorney...is **certifying** that **to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances**,...it is not being presented for any improper purpose, such as to harrass or ... cause needless increase in the cost of litigation;...[and] the claims...are warranted by existing law or by a nonfrivolous argument...." Fed. R. Bank. P. 9011(b)(1)(2) (emphasis added).

Here, the Complaint's shotgun blast does not only overshoot colorable, factual and legal targets, it appears aimed to inflict maximum collateral damage and costs. Amodeo's complaint, despite faults, at least presents a set of fairly cohesive and chronological allegations directed to the basic elements of its targeted claims. In contrast, MVI evidently decided to cherry pick through Amodeo's complaint and drop key, explicitly dated allegations that would aid in ordering a chronology – for instance, dropping allegations which explain that "[d]uring this two (2) day development of the PBS Plan" is actually a reference to the period immediately after a meeting on July 28, 2005, nearly 5 months after Beyer left BIR. (*Compare* Complaint ¶52 *with* Ex 1 ¶¶27-30). MVI, furthermore, interspersed descriptive allegations directed to the later PBS Plan, in front of dated allegations directed to the earlier Sunshine Companies Plan – for instance, alleging that AEM was created and tasked to help reorganize and preserve Presidion's PEO assets, then alleging events dated to January 2005 and April 2005, then alleging that MVI decided to acquire AEM in June 2005. (BAD 1 ¶¶30-33, 36). Along with group-pleading problems, the Complaint's selectively vague and mis-ordered allegations are aimed to create such confusion and abstraction that only a severely burdensome analysis has revealed what is, in law and fact, an absence of any supportable claim against the BIR Defendants.

## V. CONCLUSION

MVI has no good faith basis to assert claims against the BIR Defendants. MVI was never a BIR client and could not possibly fit into the narrowly defined class of third-party beneficiaries eligible to sue for alleged legal malpractice. It should not take additional rounds of pleading and motions for this Court to find (or for MVI to concede) that point.

WHEREFORE, the BIR Defendants respectfully request this Court enter its order dismissing MVI's Complaint with prejudice.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 30, 2009 I electronically filed the foregoing with the Clerk of the Court pursuant to Administrative Procedures for Electronic Filing in the Middle District of Florida by using the CM/ECF system, which will send a notice of electronic filing to the following:

Elizabeth A. Green
bankruptcynotice@lseblaw.com

Jimmy D. Parrish
bankruptcynotice@lseblaw.com

*Counsel for Plaintiff*

I further certify that I have served a true and correct copy of the foregoing on the following non-cm/ecf participant:

Joseph H. Varner, III
Knopik Varner Moore
One Harbour Place
Suite 800
777 S. Harbour Island Boulevard
Tampa, FL 33602

*Counsel for Saxon, Gilmore, Carraway,*
*Gibbons, Lash & Wilcox, P.A. and Hans Beyer*

/s/ Thomas A. Zehnder
David B. King, Trial Counsel
Florida Bar No.: 0093426
Thomas A. Zehnder
Florida Bar No.: 0063274
KING, BLACKWELL, DOWNS & ZEHNDER, P.A.
P.O. Box 1631 (Mailing)
25 E. Pine Street (Physical)

21

Case 6:08-cv-00223-KSD Doc 1810 Filed 07/30/09 Page 22 of 22

Orlando, FL 32802
Telephone: (407) 422-2472
Facsimile: (407) 648-0161
dking@kbdzlaw.com
tzehnder@kbdzlaw.com

*Counsel for Defendant*
*Buchanan, Ingersoll & Rooney, P.C.*