IN THE CIRCUIT COURT OF THE NINTH
JUDICIAL CIRCUIT, IN AND FOR
ORANGE COUNTY, FLORIDA

CASE NO.: 08-CA-31333
#37

FRANK L. AMODEO,

    Plaintiff,

vs.

BERMAN, KEAN & RIGUERA, P.A., and
RICHARD E. BERMAN,

    Defendants.
_____/

## COMPLAINT

COMES NOW the Plaintiff, FRANK L. AMODEO ("Amodeo"), by and through his undersigned counsel, and for his Complaint against the Defendants, BERMAN, KEAN & RIGUERA, P.A., ("BKR"), and RICHARD E. BERMAN, ("Berman") (BKR and Berman shall sometimes be collectively referred to herein as the "Defendants"); states and alleges as follows:

1. This is an action for damages substantially in excess of Fifteen Thousand Dollars ($15,000.00), exclusive of interest, costs, attorneys' fees and/or punitive damages.

2. Amodeo is a resident and citizen of Orange County, Florida.

3. BKR is a Florida professional association with its principal place of business in Broward County, Florida.

4. Upon information and belief, Berman is a citizen and resident of Broward County, Florida, who was at all times relevant to the events described herein a director, employee and agent of BKR and was acting within the scope of his employment and/or actual or apparent agency.



5. The Court has subject matter jurisdiction of this action pursuant to Florida Statutes §26.012(2)(a).

6. The events giving rise to the claims alleged in this Complaint arose in Orange County, Florida. Venue in this Court is therefore proper pursuant to Florida Statutes Chapter 47.

7. All conditions precedent to the bringing of this action by Amodeo have occurred, or their performance has been waived by Defendants.

## GENERAL ALLEGATIONS

8. At all times material hereto, Berman, was licensed to practice law in the State of Florida and was actively engaged in the same.

9. In or about August, 2004, Amodeo was approached by principals of Presidion Corporation, a publicly-traded company, and its affiliates and subsidiaries (collectively "Presidion"), regarding developing and implementing a plan for reorganization for Presidion.

10. At the time, Presidion owed over $13,000,000.00 in outstanding payroll tax liabilities (excluding interest and penalties), with the majority of said payroll taxes owed by certain professional employee organization ("PEO") operating subsidiaries of Presidion, including Sunshine Staff Leasing, Inc. a/k/a Presidion Solutions, I, Inc. ("Sunshine Staffing"); Sunshine Companies, II, Inc. ("Sunshine II"); Sunshine Companies, III, Inc. a/k/a Presidion Solutions, IV, Inc. ("Sunshine III"); and Sunshine Companies, IV, Inc. a/k/a Presidion Solutions, V, Inc. (Sunshine IV") (collectively the "Sunshine Companies").

11. Amodeo's proposed strategy involved deconsolidating, divesting, and liquidating the Sunshine Companies.

12. The divestiture and liquidation of the Sunshine Companies would then be used to pay creditors, including the Internal Revenue Service.

13. Additionally, Amodeo's proposed strategy allowed Presidion to deconsolidate its financials and separate itself from the excessive liabilities associated with its subsidiaries, allowing it to continue to conduct business as a going concern (collectively the "Sunshine Companies Plan").

14. Amodeo was retained by Presidion in October 2004.

15. Because of the complexities involved in the Sunshine Companies Plan, particularly with regard to legal and tax implications of the proposed strategy, Amodeo sought advice from multiple professionals, including the Defendants, who held themselves out as qualified to provide such advice.

16. In or about November 2004, Amodeo requested representation by the Defendants, who had already been retained by Amodeo since June 2003 for various other complex commercial litigation matters, with respect to the implications and potential consequences resulting from the Sunshine Companies Plan.

17. Berman attended numerous meetings and worked extensively in providing advice and counsel relevant to the Sunshine Companies Plan.

18. In particular, on December 21, 2004, Amodeo, Berman, Laurie Holtz ("Holtz") and Jose I. Marrero ("Marrero"), principals of Rachlin, Cohen, & Holtz, LLP ("Rachlin"), the General Counsel of Presidion, and various other professionals met to develop a detailed assignment of tasks with respect to the Sunshine Companies Plan.

19. At this meeting, Defendants were specifically directed by Amodeo to contact the United States Attorneys Office ("USAO") for South Florida to discuss the details of the Sunshine

-3-

Companies Plan, including the non-payment of payroll "trust fund" taxes to meet other obligations, and to confirm that proposed actions complied with all local, state, and federal tax laws.

20. On December 30, 2004 and January 4, 2005, Amodeo again contacted Defendants to inform them that the Sunshine Companies Plan would be implemented and to follow through with the tasks assigned during the December 21, 2004 meeting, specifically that Defendants were to contact the USAO for South Florida.

21. Defendants advised Amodeo that the Sunshine Companies Plan, and all actions taken and to be taken in connection therewith, complied with all local, state and federal tax laws.

22. Subsequently, in reliance upon the advice of Defendants, Amodeo began to implement the Sunshine Companies Plan as Wellington Capital Group, Inc. ("Wellington"), a company owned by Amodeo, purchased the Sunshine Companies from Presidion, immediately dissolved the Sunshine Companies, and liquidated their remaining assets for a total liquidated value of approximately $3,000,000.00, all of which was paid over to the Internal Revenue Service.

23. On January 6, 2005, Berman, Marrero, Daniel Myers, and Hans C. Beyer met with Amodeo to clarify the details of the Sunshine Companies Plan and subsequently attended a meeting with Amodeo at the Plantation, Florida Internal Revenue Service collections office (the "Plantation Office") in which the details of the Sunshine Companies Plan were specifically discussed, including the non-payment of taxes by the Sunshine Companies, of which the Internal Revenue Service was unaware.

24. In formulating and implementing the Sunshine Companies Plan, Amodeo sought, received, and relied on legal and tax advice from the Defendants, which provided, in pertinent part, that any tax liabilities incurred by a subsidiary would remain with that subsidiary and such liability

-4-

would not attach to the detriment of the parent company or affiliated subsidiaries pursuant to strict silo theory of tax liability.

25. In or about May 2005, Amodeo was approached again by Presidion regarding problems they were encountering with certain other PEO subsidiaries, particularly problems relating to worker's compensation insurance coverage, shortfall of working capital for the PEO operating subsidiaries, and a tax liability which had increased to over $80,000,000.00 since August 2004.

26. The affected Presidion subsidiaries were Presidion Solutions, Inc. ("PSI"), and its wholly owned PEO operating subsidiaries, Professional Benefits Solutions, Inc. a/k/a Presidion Solutions, VII, Inc. ("PBS") and Paradyme, Inc. ("Paradyme").

27. Furthermore, on or about July 28, 2005, during a meeting in Miami, Florida at the offices of Rachlin between Amodeo, Holtz, Berman, and other professionals regarding general matters related to the development of Mirabilis Ventures, Inc. ("Mirabilis"), a venture capital firm founded by Amodeo in early 2005, Amodeo was contacted by the principals of Presidion regarding the impending loss of worker's compensation insurance coverage for the clients of PBS and Paradyme.

28. The lack of worker's compensation insurance would have been particularly catastrophic, as it would have caused the value of the PSI, PBS, and Paradyme assets to drop drastically as well as triggered additional defaults under a variety of loan and security agreements which would have resulted in the PSI, PBS, and Paradyme assets becoming subject to immediate expropriation by secured creditors.

29. Immediately subsequent to the call from Presidion, Amodeo and Berman left the Rachlin offices to meet with Principals of Presidion in their Miami, Florida offices to discuss and seek a resolution to the worker's compensation coverage problem.

30. Over the course of the next two (2) days, professionals retained by Amodeo, including Defendants, participated in developing a strategy to resolve the various problems encountered by Presidion, PSI, PBS, and Paradyme, whereby:

    (a) The lack of worker's compensation insurance was resolved through Amodeo obtaining insurance coverage by virtue of his agreement to act as a personal indemnitor with regard to the obligations owed to the insurer; and

    (b) The lack of working capital would be provided through:

        (i) PSI truthfully and accurately accounting and reporting the taxes collected by PBS and/or Paradyme, relevant to their respective federal employer identification numbers (FEIN"); and

        (ii) Using the collected payroll tax funds to pay for services to be rendered by PSI to PBS and/or Paradyme in the ordinary course of business (i.e. worker's compensation premium payments, administrative services, information technology, critical vendor payments, etc...) (collectively the PBS Plan").

31. Defendants were actively engaged in, and a part of, the development of the PBS Plan.

32. During this two (2) day development of the PBS Plan, it was expressly discussed between Amodeo, Defendants, and various other professionals that collected payroll "trust fund" tax deposits would be used to fund the worker's compensation collateral requests so as to ensure continuing coverage.

33.     The PBS Plan would allow for accrued tax liabilities to remain with the FEIN of PBS and/or Paradyme, while providing additional funds to enable PEO operations to continue until the business was restored to a position wherein it could pay all of its outstanding liabilities.

34.     As part of the PBS Plan, Wellington subsequently purchased PSI on or about July 28, 2005, in order to preserve the value of the assets for creditors of PSI, and to preserve PSI as a viable entity so it could pursue the recovery of certain substantial claims.

35.     Additionally, on or about January 12, 2006, Berman was contacted by Craig Vanderburg ("Vanderburg"), president of PSI, PBS, and Paradyme, regarding questions raised by the USAO for South Florida about the unpaid taxes of PSI in connection with an ongoing investigation of allegedly fraudulent letters of credit issued to Presidion. Berman failed to inform Amodeo of the same or conduct an investigation into the issues raised by Vanderburg and the USAO for South Florida.

36.     At all times material hereto, Defendants were actively involved in providing advice relevant to, and directly participating in, the development and implementation of the Sunshine Companies Plan and PBS Plan, in particular:

(a)     Defendants attended numerous meetings with the Internal Revenue Service, on behalf of Amodeo, PSI, the Sunshine Companies, PBS, and Paradyme, in which the non-payment of payroll "trust fund" taxes was discussed;

(b)     Defendants assisted in answering questions asked to Amodeo, PSI, the Sunshine Companies, PBS, and Paradyme by the District Counsel for the Plantation office;

-7-

  (c) Berman participated in the drafting and revision of a narrative describing the Sunshine Companies Plan and PBS Plan; and

  (d) In or about July 2006, Berman conducted a mock deposition of Amodeo in preparation of potential depositions in connection with civil proceedings arising out of the Sunshine Companies Plan and PBS Plan, specifically with regard to the tax strategy employed (the "Mock Deposition").

37. During and after the Mock Deposition, concerns were raised by various professionals, not a party to the development of the Sunshine Companies Plan and PBS Plan, regarding the legality of the same.

38. Particularly, during a break in the Mock Deposition, Daniel Barks ("Barks"), an attorney retained by Amodeo for other matters, privately approached Berman and Holtz about problems and potential illegalities he perceived resulting from the Sunshine Companies Plan and PBS Plan.

39. Berman and Holtz insisted in their conversation with Barks that the Sunshine Companies Plan and PBS Plan, and all actions taken in connection therewith, were reasonable and complied with all local, state, and federal laws.

40. Berman did not inform Amodeo of Barks concerns.

41. Subsequent to the Mock Deposition, Berman and Holtz requested that Amodeo destroy all audio, video, and transcribed recordings of the Mock Deposition, and coached Amodeo on how to answer questions related to the Sunshine Companies Plan and PBS Plan.

42. At all times material hereto and despite multiple requests from Amodeo as to the potential consequences of the Sunshine Companies Plan and PBS Plan, Defendants neglected to

-8-

advise Amodeo that failure to intervene to stop and/or mitigate the nonpayment of collected payroll "trust fund" taxes could result in significant liability, particularly criminal liability.

43. In failing to advise Amodeo of the aforementioned criminal liability potentially resulting from the Sunshine Companies Plan and PBS Plan, Defendants obtained direct pecuniary benefits from the unlawful plans they assisted in formulating and implementing.

44. Particularly, Defendants were the direct beneficiary of significant amounts of compensation and consideration flowing from the Sunshine Companies Plan and PBS Plan and the resulting unpaid payroll "trust fund" taxes of PSI, PBS, and Paradyme, including Defendants' receipt of approximately $3,500,000.00 in professional fees for services rendered to Amodeo, the Sunshine Companies, PSI, PBS, Paradyme, and/or Mirabilis.

45. Furthermore, BKR managed approximately $21,750,000.00 in escrow funds deposited into BKR's trust account by Amodeo, the Sunshine Companies, PSI, PBS, Paradyme, and/or Mirabilis during 2005 and 2006.

46. On August 6, 2008, Amodeo was indicted on 27 counts arising out of the implementation of the Sunshine Companies Plan and PBS Plan, including but not limited to: conspiracy; failure to remit payroll taxes; and wire fraud and faced a possible 370 years in prison and fines of $6,750,000.00. Amodeo also had all of his business and personal assets seized by the Internal Revenue Service totaling approximately $13,000,000.00.

47. On September 22, 2008, Amodeo entered a plea agreement and plead guilty to five (5) counts in the indictment. Amodeo currently faces a maximum sentence of 25 years imprisonment, fines of $1,250,000.00 and a term of supervised release of not more than three years.

As part of the plea, the United Stated of America imposed a $181,000,000.00 money judgment against Amodeo.

48. Additionally, this lawsuit is being brought for the benefit of the United States of America in partial satisfaction of Amodeo's $181,000,000.00 money judgment. The net proceeds (after payment of attorney fees and costs) of any damages awarded in this case will be distributed to the United States of America, pursuant to the plea agreement signed by Amodeo and the U.S. Attorney.

49. Pursuant to the doctrine of respondeat superior, BKR is vicariously liable to Amodeo for the acts and omissions of its director, employee and/or agent Berman, all of which acts and omissions were performed within the course and scope of his actual or apparent authority and agency with BKR.

## COUNT I - NEGLIGENCE

50. Amodeo hereby reasserts by reference in this Count I the allegations of Paragraphs 1 through 49 of this Complaint as if fully set forth herein.

51. At all times material hereto, an attorney-client relationship existed between Amodeo and Defendants.

52. By accepting employment to render legal and tax advice to Amodeo, Defendants had a duty to render such services carefully, accurately, faithfully, skillfully, with reasonable expediency, and with a standard of care that accords with the standards of attorneys who are qualified by training and experience to perform similar services in the community, as the services they represented and contracted to render to Amodeo required a knowledge of law and tax that were represented as superior to that of Amodeo.

53. Defendants breached their aforementioned duties and deviated from the applicable standards of professional care, by virtue of their conduct described hereinabove, particularly, Defendants failed to advise Amodeo that the Sunshine Companies Plan and PBS Plan could result in criminal liability for individuals acting in connection therewith, including Amodeo; Defendants failed to inform Amodeo that concerns were raised by the USAO for South Florida and various other professionals about the legality of the Sunshine Companies Plan and PBS Plan; and Defendants failed to follow the instructions of Amodeo when he requested on multiple occasions that Defendants contact the USAO for South Florida regarding the potential consequences of the Sunshine Companies Plan or failed to inform Amodeo of the USAO's response.

54. As a direct and proximate result of Defendants' negligence, Amodeo was indicted on 27 counts, including but not limited to: conspiracy; failure to remit payroll taxes; and wire fraud and faced a possible 370 years in prison and fines of $6,750,000.00. Amodeo also had all of his business and personal assets seized by the Internal Revenue Service totaling over $13,000,000.

55. On September 22, 2008, Amodeo entered a plea agreement and plead guilty to five (5) counts in the indictment. Amodeo currently faces a maximum sentence of 25 years imprisonment, fines of $1,250,000.00 and a term of supervised release of not more than three years. As part of the plea, the United States of America imposed a $181,000,000.00 money judgment against Amodeo.

### COUNT II - BREACH OF FIDUCIARY DUTY AND SELF-DEALING

56. Amodeo hereby reasserts by reference in this Count II the allegations of Paragraphs 1 through 55 of this Complaint as if fully set forth herein.

-11-

57. At all times material hereto, a fiduciary relationship existed between Amodeo and Defendants, particularly, an attorney-client relationship existed between Amodeo and Defendants.

58. Defendants each breached their fiduciary duties to Amodeo, by virtue of their conduct described hereinabove, particularly, Defendants each failed to advise Amodeo that failure to intervene to stop and/or mitigate the nonpayment of collected payroll "trust fund" taxes could result in significant liability, particularly criminal liability, despite multiple requests from Amodeo as to the potential consequences of the Sunshine Companies Plan and PBS Plan; Defendants failed to inform Amodeo that concerns were raised by the USAO for South Florida and various other professionals about the legality of the Sunshine Companies Plan and PBS Plan; and Defendants failed to follow the instructions of Amodeo when he requested on multiple occasions that Defendants contact the USAO for South Florida regarding the potential consequences of the Sunshine Companies Plan or failed to accurately inform Amodeo of the USAO's response.

59. Additionally, Defendants breached their fiduciary duties to Amodeo by placing their own economic self-interest above their duties of loyalty and fidelity to Amodeo and by allowing Berman to confer a benefit upon himself in a private capacity.

60. As a direct and proximate result of Defendants' breach of fiduciary duty and self-dealing, Amodeo was indicted on 27 counts, including but not limited to: conspiracy; failure to remit payroll taxes; and wire fraud and faced a possible 370 years in prison and fines of $6,750,000.00. Amodeo also had all of his business and personal assets seized by the Internal Revenue Service totaling over $13,000,000.

61. On September 22, 2008, Amodeo entered a plea agreement and plead guilty to five (5) counts in the indictment. Amodeo currently faces a maximum sentence of 25 years

-12-

imprisonment, fines of $1,250,000.00 and a term of supervised release of not more than three years. As part of the plea, the United States of America imposed a $181,000,000.00 money judgment against Amodeo.

### COUNT III - EQUITABLE ACCOUNTING

62. Amodeo hereby reasserts by reference in this Count III the allegations of Paragraphs 1 through 61 of this Complaint as if fully set forth herein.

63. This is an action for an equitable accounting from the Defendants.

64. At all times material hereto, a fiduciary relationship existed between Amodeo and Defendants, particularly, an attorney-client relationship existed between Amodeo and Defendants.

65. Notwithstanding such fiduciary relationship, Defendants managed approximately $21,750,000.00 in escrow funds deposited into BKR's trust account by Amodeo, the Sunshine Companies, PSI, PBS, Paradyme, and/or Mirabilis during 2005 and 2006.

66. Upon information and belief, some of the $21,750,000.00 in escrow funds were utilized in extensive and complicated transactions including corporate acquisitions.

67. Amodeo has made multiple requests for a full accounting of the aforementioned trust account deposits, which Defendants have failed to provide.

68. Irreparable injury will be sustained by Amodeo if this Court does not order an accounting of the Defendants' use of the aforementioned trust account monies, so that Amodeo might discover the extent of Defendants' conduct and/or recover the assets and the profits made by the Defendants therefrom. As explained above, the net proceeds (after payment of attorney fees and costs) of any assets and/or profits recovered from Defendants will be distributed to the United States of America.

-13-

69. Amodeo lacks an adequate remedy at law.

WHEREFORE, the Plaintiff, FRANK L. AMODEO, demands the following relief:

1. That Amodeo have and recover from the Defendants the sum of $181,000,000.00 in compensatory damages resulting from Defendants' negligence, breach of fiduciary duties, and self-dealing together with pre- and post-judgment interest and taxable costs;

2. That Amodeo have and recover an equitable accounting from Defendants for their use of monies deposited in BKR's trust account;

3. That a jury be empaneled to hear this cause;

4. For such other and further relief to which Amodeo may be entitled; and

5. Plaintiff reserves the right to assert claims for punitive damages against the Defendants upon satisfying the applicable statutory prerequisites for the assertion of such claims.

DATED this 26th day of November, 2008.

THE MAHER LAW FIRM
A Professional Association
631 W. Morse Blvd., Suite 200
Winter Park, FL 32789
Phone: 407-839-0866
Fax: 407-425-7958
Attorneys for Plaintiff

_____
J. BRENT SMITH
Florida Bar No.: 10837
MICHAEL MAHER
Florida Bar No.: 92290


JACK SCAROLA, ESQ.
Florida Bar No.: 169440
**SEARCY, DENNY, SCAROLA,
BARNHART & SHIPLEY**
2139 Palm Beach Lakes Boulevard
West Palm Beach, FL 33409-6601
Phone: 561-686-6300
Fax: 561-684-5707
Attorneys for Plaintiff