# MORRIS & WIDMAN, P.A.

245 N. Tamiami Trail, Suite E
Venice, Florida 34285

Geoffrey D. Morris*
Robert C. Widman*

*Board Certified Trial Lawyer

941-484-0646
Fax 941-496-8870

Email: morwid@mwk-law.com
Website: www.morriswidman.com

March 22, 2010

**VIA FACSIMILE (813) 229-0134 and U.S. Mail**
Joseph H. Varner, III, Esquire
Holland & Knight, LLP
100 North Tampa Street, Suite 4100
Tampa, Florida 33602

Re: Mirabilis Ventures, Inc. v. Buchanan, Ingersoll, & Rooney, P.L., *et al.*

Dear Mr. Varner:

I have received and reviewed your clients' Motion for Sanctions. My investigation indicates that Mr. Beyer was fired from his prior firm Stearns, Weaver rather than Buchanan Ingersoll and that the reason was that he continued to work on asset protection trusts for clients after he had been instructed to cease. If you are willing to stipulate to an amendment reflecting this change please advise and I will be happy to do so.

As to the rest of your Motion my client will respectfully oppose your Motion.

Sincerely,

MORRIS & WIDMAN, P.A.

Robert C. Widman

RCW/dje

cc: Mr. Bill Cuthill



UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

MIRABALIS VENTURES, INC.

Debtor

---

MIRABILIS VENTURES, INC.,

Plaintiff,

v. Case No. 6:09-cv-1974-Orl-31DAB

SAXON, GILMORE, CARRAWAY, GIBBONS, LASH & WILCOX, P.A., and HANS C. BEYER, an individual and as Attorney/Agent with SAXON, GILMORE, CARRAWAY, GIBBONS, LASH & WILCOX

Defendants

---

**EXPERT WITNESS REPORT**
**OF**
**DAVID M. RICHARDSON PURSUANT TO RULE 26**

1. It is my opinion that defendants, Hans Christian Beyer ("Beyer") and the law firm in which he is a partner, Saxon, Gilmore, Carraway, Gibbons, Lash & Wilcox, P.A. ("Saxon, Gilmore), deviated from the applicable standard of conduct expected of attorneys in Florida in connection with their representation of Mirabilis Ventures, Inc.

(Mirabilis). During their representation

    a. Beyer and Saxon Gilmore represented multiple clients with adverse interests, including, Presidion Corporation, Presidion Solutions, Inc., Professional Benefits Solutions, Inc. ("PBS"), the "Sunshine Companies," Mirabilis, AQMI Strategy Corp., Wellington Capital Corp., other related companies, and Frank Amodeo (Amodeo),

    b. Beyer accepted employment by Common Paymaster Corporation (a "PEO") to work for Mirabilis and Nexia Strategy Corporation but remained a partner in Saxon, Gilmore and during that employment both Beyer and Saxon, Gilmore continued to provide legal services to Mirabilis and Nexia Strategy Corporation.

    c. Beyer and Saxon Gilmore knew or should have known, and should have, but did not inform the Mirabilis Board of Directors, that

        (i) the willful failure to pay over collected Trust Fund Taxes is a felony under IRC § 7202,

        (ii) a business plan that includes the diversion of Trust Fund Taxes from their intended use to paying operating expenses, making investments or making distributions to shareholders, if carried out, would be a willful failure to pay Trust Fund Taxes and might result in prosecution,

        (iii) the diversion of PBS's collected Trust Fund Taxes over a period of time to pay operating expenses, make investments, make

     distributions to shareholders, or provide a source of cash flow for Mirabilis, would be considered willful and might result in a felony prosecution.

    (iv) as the recipient of illegally diverted Trust Fund Taxes, Mirabilis might be linked to that illegal conduct.

 c. Beyer and Saxon Gilmore suspected that PBS and several affiliates may have engaged in other criminal activity to which Mirabilis might also be linked, including possible RICO violations and fraudulent asset transfers, but

    (i) they did not so inform Mirabilis' Board of Directors, and instead

    (ii) inappropriately reported the possible criminal activity to Amodeo who was neither an officer nor a director of Mirabilis,

and

 d. Beyer and Saxon, Gilmore acquired significant, financial interests in Mirabilis which, under the circumstances, may have made it difficult for them to give detached advice.

The basis for this opinion is the following.

In late 2004, and prior to joining Saxon, Gilmore, Beyer, represented the publicly held Presidion Corporation and certain of its subsidiaries, including PBS and the Sunshine Companies, in the development and implementation of a plan to separate the Sunshine

Corporations' operating assets from their liabilities for accrued, unpaid employment taxes ("Trust Fund Taxes"). The plan was recommended by Frank Amodeo who was working as a consultant through his wholly owned corporation AQMI Strategy Corporation ("AQMI"). Pursuant to the plan, the operating assets of the Sunshine Companies, including their "books of business," were sold to PBS, on or before December 31, 2004. The stock of the Sunshine Companies' was then sold to Wellington Capital Corporation, which was wholly owned by Frank Amodeo, in a transaction that was made effective as of midnight, December 31, 2004. On or before January 1, 2005, Amodeo became the sole director and the President, Vice President, Treasurer and Secretary of the Sunshine Companies.

In connection with the sales of the Sunshine Companies assets and stock, and at or about the same time, Mirabilis purchased the Presidion Corporation stock owned by John Bertram, a former Chairman of the Board of Directors of Presidion.

Beyer became a partner in Saxon & Gilmore in February 2005.

The threatened cancellation of PBS's Workers' Compensation insurance was the impetus for a series of transactions, referred to in various documents as the "PBS plan", that resulted in Wellington Capital Corporation paying $100,000 for the stock of Presidion Solutions (which company then owned Paradyme and PBS). This occurred on or about July 28, 2005 at which time PBS had amassed approximately $30 million in unpaid Trust Fund Taxes.

One document that suggests that Beyer was involved in planning and implementing the PBS plan. The document is entitled:

"Memorandum - Personal and Confidential Attorney Work Product - The below summary consists of mental impressions created in anticipation for litigation relevant to

interactions with Hans Beyer and his representation of Frank Amodeo."

The Memorandum suggests that Beyer knew about and approved of the plan to use Trust Fund Taxes to pay operating expenses of Presidion Solutions Inc. and PBS. It also lists a number of meetings, letters and opinions relating to the PBS plan that Beyer was said to have attended or otherwise been involved in writing or reviewing and which are said to support the allegation that Beyer failed to advise Amodeo of the potential civil and criminal liability relating to the failure to withhold and pay over Trust Fund Taxes.

Although Beyer denies that he knew of the illegal diversion of PBS's Trust Fund Taxes, if, in fact, Beyer did knew or should have known of the illegal diversion of Trust Fund Taxes and if he did not advise Amodeo, or the involved companies of the possible criminal sanctions regarding such conduct, then Beyer and Saxon, Gilmore would be guilty of mal practice.

I do not know who wrote this Memorandum and at this time am unable to verify all of the allegations in it. For that reason I am not in a position to render an opinion regarding Beyers and Saxon, Gilmore's conduct based on the representations in the Memorandum.

Beyer became an employee of Common Paymaster Corporation effective September 1, 2005. During his employment, Beyer remained a partner in Saxon Gilmore and both Beyer and Saxon, Gilmore performed legal services for Mirabilis. During that period, Beyer received a salary from Mirabilis and participated in the legal fees Mirabilis paid to Saxon Gilmore.

At the end of 2005 or in early January, 2006, Amodeo asked Beyer to compile all documents relating to the Sunshine Companies transactions. This ultimately resulted in a compilation of 145 documents and an index of them dated January 23, 2006, reflecting activities among various companies including, but not limited to, PBS, Wellington Capital Corporation,

and Mirabilis during the year's 2003 - 2006. The actual compilation of the documents has not, as of the date of this report, been located.

Information Beyer gleaned from these documents and interviews of various people, including Dan Myers, apparently provided the basis for Beyer's three page, Mirabilis Ventures, Inc., Confidential Memorandum, to the file, dated January16, 2006 ("Memorandum"). The subject of the Memorandum was "Tasks and open issues". The last section of the Memorandum, titled "Tasks to be performed" refers to five issues. Two of the issues expressly raise issues regarding the diverted Trust Fund Taxes (one referring to "§ 941 liabilities" and the other to "unpaid § 941 taxes"). One issue refers to "claims which could be brought in connection with Presidion transactions under RICO." Another issue questions whether, under the circumstances, the U.S. Trustee could "investigate/prosecute fraudulent transfer claims in a corporate bankruptcy case." The final issue suggests that they needed to determine the solvency of Presidion Corporation on a quarterly basis from January, 2003 through December 2005. This appears to be of interest in connection with "transfer in defraud of creditors" issues.

On that same day, January 16, 2006, Byers completed another "Mirabilis Ventures, Inc., Confidential Memorandum, the subject of which was "Entities and people relevant to certain transactions." In that Memorandum, on page 6, Beyer notes that PBS had a "[t]otal unassessed tax liability: $71,000,000."

Beyer sent copies of these memoranda to Amodeo, who was neither an officer nor a director of Mirabilis. This appears to be a breach of Beyer's duty to maintain Mirabilis' confidences. In addition, there is no indication that Beyer sent either Memorandum to any officer or director of Mirabilis or made any effort to follow through on the five open issues.

The extent of Amodeo's ownership or control of Mirabilis's stock throughout 2005 and 2006 is unclear. He testified in his mock deposition that his interest was less than one percent and there is some correspondence asserting that he had no interest. Others have suggested that he had a controlling interest and exercised strong control over Mirabilis' operations.

It is clear that no later than January 16, 2006, Beyer and Saxon, Gilmore knew that PBS had illegally diverted $71 million of Trust Fund Taxes. As I understand it, the forensic accounting prepared on behalf of Mirabilis in this case confirms that a substantial part of the Trust Fund Taxes illegally diverted in 2005 and 2006 was made available to Mirabilis, either directly, or indirectly. And, approximately $25 million (some part or all of which could have been used by PBS to satisfy its Trust Fund Tax liability) went through Richard Berman's law firm's trust account and most of that amount was used to purchase assets, or investments for Amodeo or Mirabilis.

Beyer and Saxon, Gilmore either *knew* or *should have known* that some of PBS' illegally diverted Trust Fund Taxes was being made available to Mirabilis. If they knew that Mirabilis received illegally diverted Trust Fund Taxes from PBS they should have, but did not, inform Mirabilis' Board of Directors as would be expected of attorneys in Florida.

Beyer testified in his Deposition (p. 23) that he was not aware that PBS funneled payroll tax into Mirabilis. It is difficult to determine whether someone knew something in the past. That Beyer may have known that PBS's unpaid Trust Fund Taxes were the source of the capital Mirabilis used to fund its operations and expansion is suggested by, among other things:

(i) the weekly meetings Beyer acknowledges having with Amodeo, the person who knew the most about the complicated facts of this case;

(ii) Beyer's certain knowledge that a large amount of Trust Fund Taxes was being diverted by PBS and that a corresponding large amount of money was being consumed by Mirabilis in a business in which Beyer was actively involved,

(iii) the fact that Amodeo told Beyer that AQMI, (a corporation wholly owned by Amodeo, and which perhaps as early as January, 2005, took over and controlled PBS's business and bank accounts), was to "continue to be" the source of funding" for Mirabilis' business development expenditures; and

(iv) the fact that Beyer was a Senior Vice President and employee of Mirabilis and must have been aware of the cost of Mirabilis' rapid expansion.

But, even if Beyer did not actually know that a part of PBS's illegally diverted Trust Fund Taxes was being funneled to Mirabilis, when he learned (no later than January 16, 2006) that in one year PBS had collected and not paid over $71 million of Trust Fund Taxes, Beyer failed to apply what is described in the Comment to Rule 4-1.1Rules of Professional Conduct as "the most fundamental legal skill." He made no attempt on behalf of Mirabilis to inquire about or analyze the factual and legal elements involved in the Trust Fund Tax problem. Such an inquiry would have been simple.

The obvious starting point would have been a question posed to Amodeo at their weekly meeting: "What happened to the $71 million of Trust Fund Taxes that PBS collected but did not turn over to the United States." The corollary might have been a question posed to officers or Board members of Mirabilis: "Where did Mirabilis get the capital it used to acquire one hundred companies in eighteen months?" With the answer to either of these questions and proper follow through by Beyer, some of what happened to Mirabilis after January 16, 2006 might have been

avoided.

Perhaps more troubling is the fact that in the January 16, 2006 Memorandum, Beyer raised other serious issues regarding criminal conduct that might have directly involved Mirabilis, including RICO violations and fraudulent transfers. But Beyer apparently made no effort to determine the extent of Mirabilis' exposure or even to inform Mirabilis about his concerns. Apparently all he did was send a copy of the Memorandum to Amodeo and put the original in his files. This does not come close to the standard of conduct Mirabilis had a right to expect from its lawyers, Beyer and Saxon, Gilmore.

What is particularly striking about Beyer's and Saxon, Gilmore's inaction in this manner is that Beyer is an experienced bankruptcy lawyer and has successfully recovered fraudulently transferred assets in major cases. He knows the issues, he knows the law involved and he knows the possible ramifications to the parties when fraudulent transfers are made and collected Trust Fund Taxes are not paid over to the United States.

Furthermore, what Beyer was concerned about was more than just money. He was concerned about major crimes having been or being committed by or linked to Mirabilis. Beyer clearly had a duty to Mirabilis bring his concerns about diverted Trust Fund Taxes, possible RICO violations, and possible fraudulent conveyances to Mirabilis' attention. Beyer's and Saxon Gilmore's failure to do so was mal practice by any standard.

If they had made such a disclosure to the Mirabilis Board of Directors in January, 2006, Beyer's and Saxon, Gilmore's conflicts of interest would have been revealed and they would have been forced them to withdraw from representation of Mirabilis and of the involved corporations or individuals. But the Mirabilis Board would have had the opportunity to take

action to mitigate the damages from its past or continued involvement. Instead, Beyer and Saxon, Gilmore took no such action and continued their financial relationship with Mirabilis for another year. Their inaction may have contributed to Mirabilis' ultimate dissolution and criminal prosecution.

Finally, although Beyer was and remained a partner in Saxon, Gilmore, he acquired multiple, significant financial interests in his client Mirabilis. He became a shareholder, an employee, and a Senior Vice President of Mirabilis. He entered into a contract with a business broker under the terms of which he would funnel business leads that he originated for Mirabilis through the broker in exchange for part of the broker's commission. And, as a Saxon, Gilmore partner, he benefitted from the fees Mirabilis, PBS and their affiliates paid to the firm. No later than January 16, 2006, Beyer and Saxon, Gilmore knew or should have known that a portion of the financial benefit they received from Mirabilis came from the illegally diverted Trust Fund Taxes which, in some sense, makes them complicit.

In a related matter, there is a letter by Saxon, Gilmore to Mirabilis, dated May 15, 2006, "Re: Acknowledgment and waiver of potential conflicts involving Hans Beyer" which was signed by the President of Mirabilis. The "waiver" came long after the events occurred that created the conflicts and confirms their insensitivity to the standards of conduct expected of lawyers in Florida. In addition to being too late, the waiver is otherwise ineffective and deceptive.

It is ineffective because no effort was made "to ensure that . . . (Mirabilis possessed) . . .information reasonably adequate to make an informed decision." Although at the time the letter was written, Saxon, Gilmore knew of the specific conflicts they were asking Mirabilis to waive,

including representation of multiple clients with conflicting interests and personal conflicts attributable to Beyer's and Saxon, Gilmore's significant financial interests in Mirabilis. But these conflicts were not disclosed and Mirabilis had no way of making an informed decision about the scope of the waiver.

The letter was deceptive in that the "Re:" description, on which a reader might focus, characterized the document as a "waiver of potential conflicts" whereas the text of the letter contains the broader description . . . "any potential or actual conflicts".

2. In the course of preparing this report, I have, referred to the documents listed in Exhibit A attached hereto. The listed documents were either selected by the Robert Widman or given to me by him at my request. Mr. Cuthill has also provided two CD's, one containing a large selection of documents and the other a single document. Although I skimmed through a few documents on first CD, I have not used any information derived only from that source in arriving at any conclusions or in preparing this report. As of this writing, I have not looked at the document on the other CD. It is possible that there are documents on the CD's, in addition to those of which I have paper copies, that may be of interest in connection with this matter.

There are some things that would be of interest in connection with this matter but which have not been located or are otherwise not available. One is the compendium of 145 documents Mr. Beyer is said to have assembled at Mr. Amodeo's request during or about January, 2006. To date, this compendium has not been located.

Also not available is the recently completed report of the plaintiff's forensic accountant, although I have seen four pages of preliminary charts the accountant prepared. That report may

provide additional details regarding the flow of the funds among related entities and people involved, and into and out of a law firm's trust fund account.

Also not available, as of the time of writing this report, are the transcripts of the depositions of several persons who are thought to have direct knowledge of what transpired among the several parties whose actions gave rise to this lawsuit. Those persons include Elena Wildermuth and Richard E. Berman, attorneys in the law firm of Berman, Kean & Riguera P.A., and Judy Berkowitz, the Internal Revenue Service Revenue Officer to whom collection of the unpaid employment taxes in question was assigned in early 2005.

Information from any of these, and other, sources might have a bearing on this opinion.

3. At this time I do not expect to use exhibits.

4. My Curriculum Vitae is attached as Exhibit B.

5. I have not testified or been deposed as an Expert Witness within the last five years.

6. My compensation is at the rate of $400 an hour.

May 31, 2010

David M. Richardson

David M. Richardson

# Mirabilis Ventures, Inc.

Preliminary Information for Discussion with Attorneys.

Berman Trust Transaction - Sources of Cash 2004 to 2007
Interest , $37,987
Mirabilis, $1,135,451
Presidion, $5,500,000
Unknown, $10,180,751
Amedeo, $5,230,000
AEM, $4,197,000

Berman Trust Transactions - Uses of Cash 2004 to 2007
To Mirabilis, $(1,563,104)
Fees, $(3,274,202)
Unknown, $(2,556,484)
Purchase MVI Subs, $(6,830,000)
Purchase FA Investments, $(9,478,836)
Purchase MVI Assets, $(2,577,877)

Tentative and Subject To Change. Berman Account Transactions with 02-08-10 Doc Prod changes